James E. SWANN et al., Appellees and
Cross-Appellants,

v.

**CHARLOTTE–MECKLENBURG BOARD
OF EDUCATION et al., Appellants
and Cross-Appellees.**

Nos. 14517, 14518.

United States Court of Appeals,
Fourth Circuit.

Argued April 9, 1970.

Decided May 26, 1970.

Certiorari Granted June 29, 1970.
See 90 S.Ct. 2247.

Certiorari Granted Oct. 6, 1970.
See 91 S.Ct. 10.

Albert V. Bryan, Circuit Judge, dissented in part and filed opinion; Sobeloff and Winter, Circuit Judges, concurred in part and dissented in part and filed opinions and each concurred in the other's opinion.

William J. Waggoner and Benjamin S. Horack, Charlotte, N. C. (Ervin, Horack & McCartha; and Weinstein, Waggoner, Sturges, Odom & Bigger, Charlotte, N. C., on brief) for appellants and cross-appellees.

J. LeVonne Chambers, Charlotte, N. C. (Adam Stein and Chambers, Stein, Ferguson & Lanning, Charlotte, N. C., Jack Greenberg, James M. Nabrit, III, New York City, and Conrad O. Pearson, Durham, N. C., on brief), for appellees and cross-appellants.

David L. Norman, Deputy Asst. Atty. Gen. of the U. S. (Jerris Leonard, Asst. Atty. Gen., Brian K. Landsberg and David D. Gregory, Attys., Dept. of Justice, and Keith S. Snyder, U. S. Atty. for the Western District of N. C., on brief) for the United States as amicus curiae.

Stephen J. Pollak, Washington, D. C. (Richard M. Sharp, Shea & Gardner, and David Rubin, Washington, D. C., on brief) for The National Education Association as amicus curiae.

William C. Cramer, M. C., St. Petersburg, Fla., amicus curiae.

Gerald Mager, for Claude R. Kirk, Jr., Governor of Florida, amicus curiae.

Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN, WINTER and BUTZNER, Circuit Judges, sitting en banc.*

---

* Judge CRAVEN disqualified himself for reasons stated in his separate opinion. 431 F.2d 135.

1. The board's plan provides: "The faculties of all schools will be assigned so that the ratio of black teachers to white teachers in each school will be approximately the same as the ratio of black teachers

BUTZNER, Circuit Judge:

The Charlotte-Mecklenburg School District appealed from an order of the district court requiring the faculty and student body of every school in the system to be racially mixed. We approve the provisions of the order dealing with the faculties of all schools [1] and the assignment of pupils to high schools and junior high schools, but we vacate the order and remand the case for further consideration of the assignment of pupils attending elementary schools. We recognize, of course, that a change in the elementary schools may require some modification of the junior and senior high school plans, and our remand is not intended to preclude this.

I.

The Charlotte-Mecklenburg school system serves a population of over 600,000 people in a combined city and county area of 550 square miles. With 84,500 pupils attending 106 schools, it ranks as the nation's 43rd largest school district. In Swann v. Charlotte-Mecklenburg Bd. of Ed., 369 F.2d 29 (4th Cir. 1966), we approved a desegregation plan based on geographic zoning with a free transfer provision. However, this plan did not eliminate the dual system of schools. The district court found that during the 1969–70 school year, some 16,000 black pupils, out of a total of 24,700, were attending 25 predominantly black schools, that faculties had not been integrated, and that other administrative practices, including a free transfer plan, tended to perpetuate segregation.

to white teachers in the entire school system." We have directed other school boards to desegregate their faculties in this manner. See Nesbit v. Statesville City Bd. of Ed., 418 F.2d 1040, 1042 (4th Cir. 1969); cf. United States v. Montgomery County Bd. of Ed., 395 U.S. 225, 232, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969).

Notwithstanding our 1965 approval of the school board's plan, the district court properly held that the board was impermissibly operating a dual system of schools in the light of subsequent decisions of the Supreme Court, Green v. County School Bd. of New Kent County, 391 U.S. 430, 435, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), Monroe v. Bd. of Com'rs, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968), and Alexander v. Holmes County Bd. of Ed., 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969).

The district judge also found that *residential patterns leading to segregation in the schools resulted in part from federal, state, and local governmental action.* These findings are supported by the evidence and we accept them under familiar principles of appellate review. The district judge pointed out that black residences are concentrated in the northwest quadrant of Charlotte as a result of both public and private action. North Carolina courts, in common with many courts elsewhere, enforced racially restrictive covenants on real property [2] until Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), prohibited this discriminatory practice. Presently the city zoning ordinances differentiate between black and white residential areas. Zones for black areas permit dense occupancy, while most white areas are zoned for restricted land usage. The district judge also found that urban renewal projects, supported by heavy federal financing and the active participation of local government, contributed to the city's racially segregated housing patterns. The school board, for its part, located schools in black residential areas and fixed the size of the schools to accommodate the needs of immediate neighborhoods. Predominantly black schools were the inevitable result. The interplay of these policies on both residential and educational segregation previously has been recognized by this and other courts.[3] The fact that similar forces operate in cities throughout the nation under the mask of *de facto* segregation provides no justification for allowing us to ignore the part that government plays in creating segregated neighborhood schools.

The disparity in the number of black and white pupils the Charlotte-Mecklenburg School Board busses to predominantly black and white schools illustrates how coupling residential patterns with the location of schools creates segregated schools. All pupils are eligible to ride school buses if they live farther than 1½ miles from the schools to which they are assigned. Overall statistics show that about one-half of the pupils entitled to transportation ride school buses. Only 541 pupils were bussed in October 1969 to predominantly black schools, which had a total enrollment of over 17,000. In contrast, 8 schools located outside the black residential area have in the aggregate only 96 students living within 1½ miles. These schools have a total enrollment of about 12,184 pupils, of whom 5,349 ride school buses.

---

2. E. g., Phillips v. Wearn, 226 N.C. 290, 37 S.E.2d 895 (1946).

3. E. g., Henry v. Clarksdale Munic. Separate School Dist., 409 F.2d 682, 689 (5th Cir.), cert. denied, 396 U.S. 940, 90 S.Ct. 375, 24 L.Ed.2d 242 (1969); United States v. School Dist. 151 of Cook County, 404 F.2d 1125, 1130 (7th Cir. 1968), aff'g 286 F.Supp. 786, 798 (N.D. Ill.1968); Brewer v. School Bd. of City of Norfolk, 397 F.2d 37, 41 (4th Cir. 1968); Keyes v. School Dist. No. One, Denver, 303 F.Supp. 279 and 289 (D. Colo.), stay pending appeal granted, (10th Cir.), stay vacated, 396 U.S. 1215, 90 S.Ct. 12, 24 L.Ed.2d 37 (1969); Dowell v. School Bd. of Oklahoma City, 244 F.Supp. 971, 975 (W.D.Okla.1965), aff'd, 375 F.2d 158 (10th Cir.), cert. denied, 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 993 (1967). See generally Fiss, Racial Imbalance in the Public Schools: The Constitutional Concepts, 78 Harv.L.Rev. 564 (1965). But see, Deal v. Cincinnati Bd. of Ed., 419 F.2d 1387 (6th Cir. 1969).

## II.

The school board on its own initiative, or at the direction of the district court, undertook or proposed a number of reforms in an effort to create a unitary school system. It closed 7 schools and reassigned the pupils primarily to increase racial mixing. It drastically gerrymandered school zones to promote desegregation. It created a single athletic league without distinction between white and black schools or athletes, and at its urging, black and white PTA councils were merged into a single organization. It eliminated a school bus system that operated on a racial basis, and established nondiscriminatory practices in other facets of the school system. It modified its free transfer plan to prevent resegregration, and it provided for integration of the faculty and administrative staff.

The district court, after a painstaking analysis of the board's proposals and the relevant authorities, disapproved the board's final plan, primarily because it left ten schools nearly all black. In reaching this decision, the district court held that the board must integrate the student body of every school to convert from a dual system of schools, which had been established by state action, to a unitary system.

■ The necessity of dealing with segregation that exists because governmental policies foster segregated neighborhood schools is not confined to the Charlotte-Mecklenburg School District. Similar segregation occurs in many other cities throughout the nation, and constitutional principles dealing with it should be applied nationally. The solution is not free from difficulty. It is now well settled that school boards operating dual systems have an affirmative duty "to convert to a unitary school system in which racial discrimination would be eliminated root and branch." Green v. School Bd. of New Kent County, 391 U.S. 430, 437, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). Recently the Supreme Court defined a unitary school system as one "within which no person is to be effectively excluded from any school because of race or color." Alexander v. Holmes County Bd. of Ed., 396 U.S. 19, 20, 90 S.Ct. 29, 30, 24 L.Ed.2d 19 (1969). This definition, as the Chief Justice noted in Northcross v. Board of Ed. of Memphis, 397 U.S. 232, 90 S.Ct. 891, 893, 25 L.Ed.2d 246 (1970), leaves open practical problems, "including whether, as a constitutional matter, any particular racial balance must be achieved in the schools; to what extent school districts and zones may or must be altered as a constitutional matter; to what extent transportation may or must be provided to achieve the ends sought by prior holdings of the Court."

■ Several of these issues arise in this case. To resolve them, we hold: first, that not every school in a unitary school system need be integrated; second, nevertheless, school boards must use all reasonable means to integrate the schools in their jurisdiction; and third, if black residential areas are so large that not all schools can be integrated by using reasonable means, school boards must take further steps to assure that pupils are not excluded from integrated schools on the basis of race. Special classes, functions, and programs on an integrated basis should be made available to pupils in the black schools. The board should freely allow majority to minority transfers and provide transportation by bus or common carrier so individual students can leave the black schools. And pupils who are assigned to black schools for a portion of their school careers should be assigned to integrated schools as they progress from one school to another.

■ We adopted the test of reasonableness—instead of one that calls for absolutes—because it has proved to be a reliable guide in other areas of the

law. Furthermore, the standard of reason provides a test for unitary school systems that can be used in both rural and metropolitan districts. All schools in towns, small cities, and rural areas generally can be integrated by pairing, zoning, clustering, or consolidating schools and transporting pupils. Some cities, in contrast, have black ghettos so large that integration of every school is an improbable, if not an unattainable, goal. Nevertheless, if a school board makes every reasonable effort to integrate the pupils under its control, an intractable remnant of segregation, we believe, should not void an otherwise exemplary plan for the creation of a unitary school system. Ellis v. Board of Public Instruc. of Orange County, 423 F.2d 203 (5th Cir. 1970).

### III.

The school board's plan proposes that pupils will be assigned to the system's ten high schools according to geographic zones. A typical zone is generally fan shaped and extends from the center of the city to the suburban and rural areas of the county. In this manner the board was able to integrate nine of the high schools with a percentage of black students ranging from 17% to 36%. The projected black attendance at the tenth school, Independence, which has a maximum capacity of 1400 pupils, is 2%.

The court approved the board's high school plan with one modification. It required that an additional 300 pupils should be transported from the black residential area of the city to Independence School.

The school board proposed to rezone the 21 Junior high school areas so that black attendance would range from 0% to 90% with only one school in excess of 38%. This school, Piedmont, in the heart of the black residential area, has an enrollment of 840 pupils, 90% of whom are black. The district court disapproved the board's plan because it maintained Piedmont as a predominantly black school. The court gave the board four options to desegregate all the junior high schools: (1) rezoning; (2) two-way transportation of pupils between Piedmont and white schools; (3) closing Piedmont and reassigning its pupils; and (4) adopting a plan proposed by Dr. John A. Finger, Jr., a consultant appointed by the court, which combined zoning with satellite districts. The board, expressing a preference for its own plan, reluctantly adopted the plan proposed by the court's consultant.

Approximately 31,000 white and 13,000 black pupils are enrolled in 76 elementary schools. The board's plan for desegregating these schools is based entirely upon geographic zoning. Its proposal left more than half the black elementary pupils in nine schools that remained 86% to 100% black, and assigned about half of the white elementary pupils to schools that are 86% to 100% white. In place of the board's plan, the court approved a plan based on zoning, pairing, and grouping, devised by Dr. Finger, that resulted in student bodies that ranged from 9% to 38% black.

The court estimated that the overall plan which it approved would require this additional transportation:

|  | No. of pupils | No. of buses | Operating cost |
|---|---|---|---|
| Senior High | 1,500 | 20 | $ 30,000 |
| Junior High | 2,500 | 28 | $ 50,000 |
| Elementary | 9,300 | 90 | $186,000 |
| TOTAL | 13,300 | 138 | $266,000 |

In addition, the court found that a new bus cost about $5,400, making a total outlay for equipment of $745,200. The total expenditure for the first year would be about $1,011,200.

The school board computed the additional transportation requirements under the court approved plan to be:

|  | No. of pupils | No. of buses | Operating cost |
|---|---|---|---|
| Senior High | 2,497 | 69 | $ 96,000 |
| Junior High | 4,359 | 84 | $116,800 |
| Elementary | 12,429 | 269 | $374,000 |
| TOTAL | 19,285 | 422 | $586,800 |

In addition to the annual operating cost, the school board projected the following expenditures:

| | |
|---|---|
| Cost of buses | $2,369,100 |
| Cost of parking areas | 284,800 |
| Cost of additional personnel | 166,200 |

Based on these figures, the school board computed the total expenditures for the first year would be $3,406,700 under the court approved plan.[4]

Both the findings of the district court and the evidence submitted by the board are based on estimates that rest on many variables. Past practice has shown that a large percentage of students eligible for bus transportation prefer to provide their own transportation. However, it is difficult to accurately predict how many eligible students will accept transportation on the new routes and schedules. The number of students that a bus can carry each day depends in part on the number of trips the bus can make. Scheduling two trips for a bus generally reduces costs. But student drivers may not be able to spend the time required for two trips, so that adult drivers will have to be hired at substantially higher salaries. It is difficult to accurately forecast how traffic delays will affect the time needed for each trip, for large numbers of school buses themselves generate traffic problems that only experience can measure.

The board based its projections on each 54-passenger bus carrying about 40 high school pupils or 54 junior high and elementary pupils for one roundtrip a day. Using this formula, it arrived at a need of 422 additional buses for transporting 19,285 additional pupils. This appears to be a less efficient operation than the present system which transports 23,600 pupils with 280 buses, but the board's witnesses suggest that prospects of heavier traffic justify the difference. The board also envisioned parking that seems to be more elaborate than that currently used at some schools.

In making its findings, the district court applied factors derived from present bus operation, such as the annual operating cost per student, the average number of trips each bus makes, the capacity of the buses—including permissible overloads, and the percentage of eligible pupils who use other forms of transportation. The district court also found no need for expensive parking facilities or for additional personnel whose costs could not be absorbed by the amount allocated for operating expenses. While we recognize that no estimate—whether submitted by the board or made by the court—can be absolutely correct, we accept as not clearly erroneous the findings of the district court.

Opposition to the assignment of pupils under both the board's plan and the plan the court approved centered on bussing,

4. The school board computed transportation requirements under the plan it submitted to be:

| | No. of pupils | No. of buses | Operating cost |
|---|---|---|---|
| Senior High | 1,202 | 30 | $ 41,700 |
| Junior High | 1,388 | 33 | $ 45,900 |
| Elementary | 2,345 | 41 | $ 57,000 |
| TOTAL | 4,935 | 104 | $144,600 |

The board estimated that the breakdown of costs for the first year of operation under its plan would be:

| | | |
|---|---|---|
| Cost of buses | | $589,900 |
| Cost of parking areas | | 56,200 |
| Operating expenses of | $144,600 | |
| Plus depreciation allowance of | 31,000 | |
| | | 175,600 |
| Cost of additional personnel | | 43,000 |

The estimated total first-year costs are $864,700.

which numbers among its critics both black and white parents. This criticism, however, cannot justify the maintenance of a dual system of schools. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed. 2d 5 (1958). Bussing is neither new nor unusual. It has been used for years to transport pupils to consolidated schools in both racially dual and unitary school systems. Figures compiled by the National Education Association show that nationally the number of pupils bussed increased from 12 million in the 1958–59 school year to 17 million a decade later. In North Carolina 54.9% of all pupils are bussed. There the average daily roundtrip is 24 miles, and the annual cost is over $14,000,000. The Charlotte-Mecklenburg School District presently busses about 23,600 pupils and another 5,000 ride common carriers.

■ Bussing is a permissible tool for achieving integration, but it is not a panacea. In determining who should be bussed and where they should be bussed, a school board should take into consideration the age of the pupils, the distance and time required for transportation, the effect on traffic, and the cost in relation to the board's resources. The board should view bussing for integration in the light that it views bussing for other legitimate improvements, such as school consolidation and the location of new schools. In short, the board should draw on its experience with bussing in general —the benefits and the defects—so that it may intelligently plan the part that

bussing will play in a unitary school system.

■ Viewing the plan the district court approved for junior and senior high schools against these principles and the background of national, state, and local transportation policies, we conclude that it provides a reasonable way of eliminating all segregation in these schools. The estimated increase in the number of junior and senior high school students who must be bussed is about 17% of all pupils now being bussed. The additional pupils are in the upper grades and for the most part they will be going to schools already served by buses from other sections of the district. Moreover, the routes they must travel do not vary appreciably in length from the average route of the system's buses. The transportation of 300 high school students from the black residential area to suburban Independence School will tend to stabilize the system by eliminating an almost totally white school in a zone to which other whites might move with consequent "tipping" or resegregation of other schools.[5]

■ We find no merit in other criticism of the plan for junior and senior high schools. The use of satellite school zones [6] as a means of achieving desegregation is not improper. District courts have been directed to shape remedies that are characterized by the "practical flexibility" that is a hallmark of equity. See Brown v. Board of Ed., 349 U.S.

5. These 300 students will be bussed a straight-line distance of some 10 miles. The actual bus routes will be somewhat longer, depending upon the route chosen. A reasonable estimate of the bus route distance is 12 to 13 miles. The principal's monthly bus reports for Independence High School for the month from January 10, 1970 to February 10, 1970 shows the average one-way length of a bus route at Independence is presently 16.7 miles for the first trip. Buses that make two trips usually have a shorter second trip. The average one-way bus route, including both

first and second trips, is 11.7 miles. Thus the distance the 300 pupils will have to be bussed is nearly the same as the average one-way bus route of the students presently attending Independence, and it is substantially shorter than the system's average one-way bus trip of 17 miles.

6. Satellite school zones are non-contiguous geographical zones. Typically, areas in the black core of the city are coupled— but not geographically linked—with an area in white suburbia.

294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). Similarly, the pairing and clustering of schools has been approved. Green v. School Bd. of New Kent County, 391 U.S. 430, 442 n. 6, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Hall v. St. Helena Parish School Bd., 417 F.2d 801, 809 (5th Cir.), cert. denied, 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969).

The school board also asserts that §§ 401(b) and 407(a) (2) of the Civil Rights Act of 1964 [42 U.S.C. §§ 2000c(b) and 2000c-6(a) (2)] forbid the bussing ordered by the district court.[7] But this argument misreads the legislative history of the statute. Those provisions are not limitations on the power of school boards or courts to remedy unconstitutional segregation. They were designed to remove any implication that the Civil Rights Act conferred new jurisdiction on courts to deal with the question of whether school boards were obligated to overcome *de facto* segregation. See generally, United States v. School District 151, 404 F.2d 1125, 1130 (7th Cir. 1968); United States v. Jefferson County Board of Ed., 372 F.2d 836, 880 (5th Cir. 1966), aff'd on rehearing en banc 380 F.2d 385 (5th Cir.), cert. denied, sub nom. Caddo Parish School Bd. v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967); Keyes v. School Dist. No. One,

Denver, 303 F.Supp. 289, 298 (D.Colo.), stay pending appeal granted (10th Cir.), stay vacated, 396 U.S. 1215, 90 S.Ct. 12, 24 L.Ed.2d 37 (1969). Nor does North Carolina's anti-bussing law present an obstacle to the plan, for those provisions of the statute in conflict with the plan have been declared unconstitutional. Swann v. Charlotte-Mecklenburg Bd. of Ed., 311 F.Supp. 265 (W.D.N.C.1970).[8]

The district court properly disapproved the school board's elementary school proposal because it left about one-half of both the black and white elementary pupils in schools that were nearly completely segregated. Part of the difficulty concerning the elementary schools results from the board's refusal to accept the district court's suggestion that it consult experts from the Department of Health, Education, and Welfare. The consultants that the board employed were undoubtedly competent, but the board limited their choice of remedies by maintaining each school's grade structure. This, in effect, restricted the means of overcoming segregation to only geographical zoning, and as a further restriction the board insisted on contiguous zones. The board rejected such legitimate techniques as pairing, grouping, clustering, and satellite zoning. Moreover, the board sought to impose a ratio in each school of not less than 60% white students. While a 60%–

7. Title 42 U.S.C. § 2000c(b) provides that as used in the subchapter on Public Education of the Civil Rights Act of 1964:
   " 'Desegregation' means the assignment of students to public schools and within such schools without regard to their race, color, religion, or national origin, but 'desegregation' shall not mean the assignment of students to public schools in order to overcome racial imbalance."
   Title 42 § 2000c-6(a) (2) states in part:
   "[P]rovided that nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school

to another or one school district to another in order to achieve such racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards."

8. The unconstitutional provisions are:
   "No student shall be assigned or compelled to attend any school on account of race, creed, color or national origin, or for the purpose of creating a balance or ratio of race, religion or national origins. Involuntary bussing of students in contravention of this article is prohibited, and public funds shall not be used for any such bussing." N.C.Gen.Stat. §§ 115–176.1 (Supp.1969).

40% ratio of white to black pupils might be desirable under some circumstances, rigid adherence to this formula in every school should not be allowed to defeat integration.

On the other hand, the Finger plan, which the district court approved, will require transporting 9,300 pupils in 90 additional buses. The greatest portion of the proposed transportation involves cross-bussing to paired schools—that is, black pupils in grades one through four would be carried to predominantly white schools, and white pupils in the fifth and sixth grades would be transported to the black schools. The average daily round-trip approximates 15 miles through central city and suburban traffic.

The additional elementary pupils who must be bussed represent an increase of 39% over all pupils presently being bussed, and their transportation will require an increase of about 32% in the present fleet of buses. When the additional bussing for elementary pupils is coupled with the additional requirements for junior and senior high schools, which we have approved, the total percentages of increase are: pupils, 56%, and buses, 49%. The board, we believe, should not be required to undertake such extensive additional bussing to discharge its obligation to create a unitary school system.

### IV.

Both parties oppose a remand. Each side is adamant that its position is correct—the school board seeks total approval of its plan and the plaintiffs insist on implementation of the Finger plan. We are favorably impressed, however, by the suggestion of the United States, which at our invitation filed a brief as amicus curiae, that the school board should consider alternative plans, particularly for the elementary schools. We, therefore, will vacate the judgment of the district court and remand the case for reconsideration of the assignment of pupils in the elementary schools, and for adjustments, if any, that this may require in plans for the junior and senior high schools.

On remand, we suggest that the district court should direct the school board to consult experts from the Office of Education of the Department of Health, Education, and Welfare, and to explore every method of desegregation, including rezoning with or without satellites, pairing, grouping, and school consolidation. Undoubtedly some transportation will be necessary to supplement these techniques. Indeed, the school board's plan proposed transporting 2,300 elementary pupils, and our remand should not be interpreted to prohibit all bussing. Furthermore, in devising a new plan, the board should not perpetuate segregation by rigid adherence to the 60% white–40% black racial ratio it favors.

If, despite all reasonable efforts to integrate every school, some remain segregated because of residential patterns, the school board must take further steps along the lines we previously mentioned, including a majority to minority transfer plan,[9] to assure that

9. The board's plan provides:
"Any black student will be permitted to transfer only if the school to which he is originally assigned has more than 30 per cent of his race and if the school he is requesting to attend has less than 30 per cent of his race and has available space. Any white student will be permitted to transfer only if the school to which he is originally assigned has more than 70 per cent of his race and if the school he is requesting to attend has less than 70 per cent of his race and has availabe space."

This clause, which was designed to prevent tipping or resegregation, would be suitable if all schools in the system were integrated. But since the board envisions some elementary schools will remain nearly all black, it unduly restricts the schools to which pupils in these schools can transfer. It should be amended to allow these elementary pupils to transfer to any school in which their race is a minority if space is available.

no pupil is excluded from an integrated school on the basis of race.

Alexander v. Holmes County Bd. of Ed., 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969), and Carter v. West Feliciana School Bd., 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970), emphasize that school boards must forthwith convert from dual to unitary systems. In Nesbit v. Statesville City Bd. of Ed., 418 F.2d 1040 (4th Cir. 1969), and Whittenberg v. School Dist. of Greenville County, 424 F.2d 195 (4th Cir. 1970), we reiterated that immediate reform is imperative. We adhere to these principles, and district courts in this circuit should not consider the stays which were allowed because of the exceptional nature of this case to be precedent for departing from the directions stated in *Alexander, Carter, Nesbit,* and *Whittenberg.*

Prompt action is also essential for the solution of the remaining difficulties in this case. The school board should immediately consult with experts from HEW and file its new plan by June 30, 1970. The plaintiffs should file their exceptions, if any, within 7 days, and the district court should promptly conduct all necessary hearings so that the plan may take effect with the opening of school next fall. Since time is pressing, the district court's order approving a new plan shall remain in full force and effect unless it is modified by an order of this court. After a plan has been approved, the district court may hear additional objections or proposed amendments, but the parties shall comply with the approved plan in all respects while the district court considers the suggested modifications. Cf. Nesbit v. Statesville City Bd. of Ed., 418 F.2d 1040, 1043 (4th Cir. 1969).

Finally, we approve the district court's inclusion of Dr. Finger's consultant fee in the costs taxed against the board. See In the Matter of Peterson, 253 U.S. 300, 312, 40 S.Ct. 543, 64 L.Ed. 919 (1920). We caution, however, that when a court needs an expert, it should avoid appointing a person who has appeared as a witness for one of the parties. But the evidence discloses that Dr. Finger was well qualified, and his dual role did not cause him to be faithless to the trust the court imposed on him. Therefore, the error, if any, in his selection, was harmless.

We find no merit in the other objections raised by the appellants or in the appellees' motion to dismiss the appeal. The judgment of the district court is vacated, and the case is remanded for further proceedings consistent with this opinion.

SOBELOFF, Circuit Judge, with whom WINTER, Circuit Judge, joins, concurring in part and dissenting in part:

Insofar as the court today affirms the District Court's order in respect to the senior and junior high schools, I concur. I dissent from the failure to affirm the portion of the order pertaining to the elementary schools.

I

THE BASIC LAW AND THE PARTICULAR FACTS

All uncertainty about the constitutional mandate of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), was put to rest when in Green v. County School Board of New Kent County the Supreme Court spelled out a school board's "affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch," 391 U.S. 430, 437–438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). "Disestablish[ment of] state-imposed segregation" (at 439, 88 S.Ct. 1689, 1695) entailed "steps which promise realistically to convert promptly to a system without a 'white' school and a 'Negro' school, but just schools" (at 442, 88 S.Ct. at 1696). If there could still be doubts they were answered this past year. In Alexander v. Holmes County Board of

Education, the Court held that "[u]nder explicit holdings of this Court the obligation of every school district is to terminate dual school systems at once and to operate now and hereafter only unitary schools," 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). The command was once more reaffirmed in Carter v. West Feliciana School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970), requiring "relief that will at once extirpate any lingering vestiges of a constitutionally prohibited dual school system." (Harlan, J., concurring at 292, 90 S.Ct. at 609).

We face in this case a school district divided along racial lines. This is not a fortuity. It is the result, as the majority has recognized, of government fostered residential patterns, school planning, placement, and, as the District Court found, gerrymandering. These factors have interacted on each other so that by this date the black and white populations, in school and at home, are virtually entirely separate.

As of November 7, 1969, out of 106 schools in the system, 57 were racially identifiable as white, 25 were racially identifiable as black.[1] Of these, nine were all white schools and eleven all black. Of 24,714 black students in the system, 16,000 were in entirely or predominantly black schools.

There are 76 elementary schools with over 44,000 pupils. In November 1969, 43 were identifiable as white, 16 as black, with 13 of the latter 98% or more black, and none less than 65%.. For the future the Board proposes little improvement. There would still be 25 iden-

tifiably white elementary schools and approximately half of the white elementary students would attend schools 86 to 100% white. Nine schools would remain 83 to 100% black, serving 6,432 students or over half the black elementary pupils.

To call either the past or the proposed distribution a "unitary system" would be to embrace an illusion.[2] And the majority does not contend that the system is unitary, for it holds that "the district court properly disapproved the school board's elementary school proposal because it left about one-half of both the black and white elementary pupils in schools that were nearly completely segregated." The Board's duty then is plain and unarguable: to convert to a unitary system. The duty is absolute. It is not to be tempered or watered down. It must be done, and done now.

## II

### THE COURT-ORDERED PLAN

A. *The Necessity of the Court-Ordered Plan*

The plan ordered by the District Court works. It does the job of desegregating the schools completely. This "places a heavy burden upon the board to explain its preference for an apparently less effective method." *Green, supra*, 391 U.S. at 439, 88 S.Ct. at 1695.

The most significant fact about the District Court's plan is that it—or one like it—is the only one that can work. Obviously, when the black students are all on one side of town, the whites on

1. In the entire system, 71% of the pupils are white, 29% of the pupils are black. The District Judge deemed a school having 86% or greater white population identifiable as white, one with 56% or greater black population identifiable as black.

2. In its application to us for a stay pending appeal, counsel for the School Board relied heavily on Northcross v. Board of Education of Memphis, 420 F.2d 546 (6th Cir. 1970), as a judicial ruling that

school assignments based on residence are constitutionally immune. The defendant tendered us a statistical comparison of pupil enrollment by school with pupil population by attendance area for the Memphis school system.

Since then the Supreme Court in *Northcross* has ruled that the Court of Appeals erred insofar as it held that the Memphis board "is not now operating a 'dual school system' * * *." 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246.

the other, only transportation will bring them together. The District Judge is quite explicit:

> Both Dr. Finger and the school board staff appear to have agreed, and the court finds as a fact, that for the present at least, there is no way to desegregate the all-black schools in Northwest Charlotte without providing (and continuing to provide) bus or other transportation for thousands of children. All plans and all variations of plans considered for this purpose lead in one fashion or another to that conclusion.

The point has been perceived by the counsel for the Board who have candidly informed us that if the job must be done then the Finger plan is the way to do it.

The only suggestion that there is a possible alternative *middle course* came from the United States, participating as amicus curiae. Its brief was prefaced by the following revealing confession:

> We understand that the record in the case is voluminous, and we would note at the outset that we have been unable to analyze the record as a whole. Although we have carefully

examined the district court's various opinions and orders, the school board's plan, and those pleadings readily available to us, we feel that we are not conversant with all of the factual considerations which may prove determinative of this appeal. Accordingly, we here attempt, not to deal extensively with factual matters, but rather to set forth some legal considerations which may be helpful to the Court.

Notwithstanding this disclaimer, the Government went on to imply in oral argument—and has apparently impressed on this court—that HEW could do better. No concrete solution is suggested but the Government does advert to the possibility of pairing and grouping of schools. Two points stand out. First, pairing and grouping are precisely what the Finger plan, adopted by the District Court, does. Second, in the circumstances of this case, these methods necessarily entail bussing.

I am not "favorably impressed" by the Government's performance. Its vague and noncommital representations do little but obscure the real issues, introduce uncertainty and fail to meet the "heavy burden" necessary to overturn the District Court's effective plan.[3]

---

3. A federal judge is not required to consult with the Department of Health, Education and Welfare on legal issues. What is the constitutional objective of a plan, and whether a unitary system has been or will be achieved, are questions for the court. HEW's interpretation of the constitutional command does not bind the courts.

> [W]hile administrative interpretation may lend a persuasive gloss to a statute, the definition of constitutional standards controlling the actions of states and their subdivisions is peculiarly a judicial function.

Bowman v. County School Board of Charles City County, 382 F.2d 326 (4th 1967).

Although the definition of goals is for the court, HEW may be able to provide technical assistance in overcoming the logistical impediments to the desegregation of a school system. Thus it was quite understandable that at the outset of this case the District Court invited the Board to consult with HEW. Desegregation of this large educational system was likely to be a complex and administratively difficult task, in which the expertise of the federal agency might be of help. However, after a substantial period of time and the beginning of a new school year, it became clear that the Board had no intention of devising a meaningful plan, much less seeking advice on how to do so. At that point (December 1969) with the need for speed in mind, the Judge appointed an expert already familiar with the school system to work with the school staff in developing a plan.

Whether to utilize the assistance of HEW is ordinarily up to the district judge. Consultation in formulating the mechanics of a plan is not obligatory. The method used by the Judge in this case was certainly sufficient. Moreover, now that a plan has been created and it appears that there are no real alternatives, a remand for HEW's advice seems an exercise in futility.

## B. *The Feasibility of the Plan*

Of course it goes without saying that school boards are not obligated to do the impossible. Federal courts do not joust at windmills. Thus it is proper to ask whether a plan is feasible, whether it can be accomplished. There is no genuine dispute on this point. The plan is simple and quite efficient. A bus will make one pickup in the vicinity of the children's residences, say in the white residential area. It then will make an express trip to the inner-city school. Because of the non-stop feature, time can be considerably shortened and a bus could make a return trip to pick up black students in the inner city and to convey them to the outlying school. There is no evidence of insurmountable traffic problems due to the increased bussing.[4] Indeed, straight line bussing promises to be quicker. The present average one-way trip is over 15 miles and takes one hour and fourteen minutes; under the plan the average one-way trip for elementary students will be less than seven miles and 35 minutes. The cost of all of the additional bussing will be less than one week's operating budget.[5]

## C. *The Standard of Review*

In *Brown* II, the Supreme Court charged the district courts with the en-forcement of the dictates of *Brown* I. The lower courts were to have "a practical flexibility in shaping * * * remedies." 349 U.S. at 300, 75 S.Ct. at 756, 99 L.Ed. 1083. Thus, in subsuming these cases under traditional equity principles, the Supreme Court brought the desegregation decree within the rule that to be overturned it "must [be] demonstrate[d] that there was no reasonable basis for the District Judge's decision." United States v. W. T. Grant Co., 345 U.S. 629, 634, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953). This court has paid homage to this maxim of appellate review when, in the past, a district judge has ordered less than comprehensive relief. Bradley v. School Board of City of Richmond, 345 F.2d 310, 320 (4th Cir. 1965), vac., 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed. 2d 187 (1965). What is called for here is similar deference to an order that would finally inter the dual system and not preserve a nettlesome residue. As the Supreme Court made clear in *Green, supra,* those who would challenge an effective course of action bear a "heavy burden." The Finger plan is a remarkably economical scheme when viewed in the light of what it accomplishes. There has been no showing that it can be improved or replaced by better or more

---

4. The only indication I have encountered that a serious traffic problem will be occasioned by the additional bussing is found in an affidavit by the City Director of Traffic Engineering. His statement is based on the exaggerated bus estimate prepared by the Board and rejected by the District Court. See note 5, *infra*. Moreover, he appears to have relied to a large extent on the erroneous assumption that under the plan busses would pick up and discharge passengers along busy thoroughfares, thus causing "stop-and-go traffic of slow moving school busses in congested traffic."

A later affidavit of the same official, filed at the request of the District Court, affords more substantial data. It reveals that the total estimated number of automobile trips per day in Charlotte and Mecklenburg County (not including internal truck trips) is 869,604. That the 138 additional busses would gravely aggra-vate the congestion is dubious, to say the least.

5. The District Judge rejected the Board's inflated claims, and found that altogether the Finger plan would bus 13,300 new students in 138 additional busses. The Board had estimated that 19,285 additional pupils would have to be transported, requiring 422 additional busses. This estimate is disproportionate on its face, for presently 23,600 pupils are transported in 280 busses. As indicated above, the direct bus routes envisioned by the Finger plan should accomplish increased, not diminished, efficiency. The court below, after close analysis, discounted the Board's estimate for other reasons as well, including the "very short measurements" used by the Board in determining who would have to be bussed, the failure of the Board to account for round-trips, staggering of opening and closing hours, and overloads.

palatable means. It should, then, be sustained.

## III

## OBJECTIONS RAISED AGAINST THE COURT-ORDERED PLAN

### A. The "Illegal" Objective of the Plan

My Brother Bryan expresses concern about the plan, regardless of cost, because it undertakes, in his view, an illegal objective: "achieving racial balance." Whatever might be said for this view abstractly or in another context, it is not pertinent here. We are confronted in this case with no question of bussing for mere balance unrelated to a mandatory constitutional goal. What the District Court has ordered is compliance with the constitutional imperative to disestablish the existing segregation. Unless we are to palter with words, desegregation necessarily entails integration, that is to say integration in some substantial degree. The dictum to the contrary in Briggs v. Elliott, 132 F. Supp. 776 (E.D.S.C.1955), was rejected by necessary implication by the Supreme Court in *Green, supra,* and explicitly by this court in Walker v. County School Board of Brunswick Co., 413 F.2d 53, 54 n. 2 (4th Cir. 1969).

As my Brother Winter shows, there is no more suitable way of achieving this task than by setting, at least initially, a ratio roughly approximating that of the racial population in the school system. The District Judge adopted this *ad hoc* measurement as a starting guide, expressed a willingness to accept a degree of modification,[6] and departed from it where circumstances required.

### B. The "Unreasonableness" of the Plan

The majority does not quarrel with the plan's objective, nor, accepting the findings of the District Court, does it really dispute that the plan can be achieved. Rather, we are told, the plan is an unreasonable burden.

This notion must be emphatically rejected. At bottom it is no more than an abstract, unexplicated judgment—a conclusion of the majority that, all things considered, desegregation of this school system is not worth the price. This is a conclusion neither we nor school boards are permitted to make.

In making policy decisions that are not constitutionally dictated, state authorities are free to decide in their discretion that a proposed measure is worth the cost involved or that the cost is unreasonable, and accordingly they may adopt or reject the proposal. This is not such a case. Vindication of the plaintiffs' constitutional right does not rest in the school board's discretion, as the Supreme Court authoritatively decided sixteen years ago and has repeated with increasing emphasis. It is not for the Board or this court to say that the cost of compliance with *Brown* is "unreasonable."

That a subjective assessment is the operational part of the new "reasonableness" doctrine is highlighted by a study of the factors the majority bids school boards take into account in making bussing determinations. "[A] school board should take into consideration the age of the pupils, the distance and time required for transportation, the effect on traffic, and the cost in relation to the board's resources." But as we have seen, distance and time will be compara-

---

6. The District Judge wrote in his December 1 order that

> Fixed ratios of pupils in particular schools will not be set. If the board in one of its three tries had presented a plan for desegregation, the court would have sought ways to approve variations in pupil ratios. In default of any such plan from the school board, the court

will start with the thought, originally advanced in the order of April 23, that efforts should be made to reach a 71–29 ratio in the various schools so that there will be no basis for contending that one school is racially different from the others, but to understand that variations from that norm may be unavoidable.

tively short, the effect on traffic is undemonstrated, and the incremental cost is marginal. As far as age is concerned, it has never prevented the bussing of pupils in Charlotte-Mecklenburg, or in North Carolina generally, where 70.9% of all bussed students are elementary pupils.

If the transportation of elementary pupils were a novelty sought to be introduced by the District Court, I could understand my brethren's reluctance. But, as is conceded, bussing of children of elementary school age is an established tradition. Bussing has long been used to perpetuate dual systems.[7] More importantly, bussing is a recognized educational tool in Charlotte-Mecklenburg and North Carolina. And as the National Education Association has admirably demonstrated in its brief, bussing has played a crucial role in the evolution from the one-room schoolhouse in this nation. Since the majority accepts the legitimacy of bussing, today's decision totally baffles me.

In the final analysis, the elementary pupil phase of the Finger plan is disapproved because the percentage increase in bussing is somehow determined to be too onerous.[8] Why this is so we are not told. The Board plan itself would bus 5000 additional pupils. The fact remains that in North Carolina 55% of all pupils are now being bussed. Under the Finger plan approximately 47% of the Charlotte-Mecklenburg student population would be bussed. This is well within the existing percentage throughout the state.

The majority's proposal is inherently ambiguous. The court-ordered plan is said to be unreasonable. Yet the School Board's own plan has also been disapproved. Does the decision—that the Finger plan is unreasonable—depend on the premise that an intermediate course is available? Would the amount of segregation retained in the School Board's plan be avowedly sanctioned if it were recognized that nothing short of the steps delineated in the District Court's plan will suffice to eliminate it? Since there is no practicable alternative, must we assume that the majority is willing to tolerate the deficiencies in the Board plan?

These questions remain unresolved and thus the ultimate meaning of the "reasonableness" doctrine is undefined. Suffice it to say that this case is not an appropriate one in which to grapple with the theoretical issue whether the law can endure a slight but irreducible remnant of segregated schools. This record presents no such problem. The remnant of racially identifiable elementary schools, to which the District Court addressed itself, encompasses over half the elementary population. This large fraction cannot be called slight; nor, as the Finger plan demonstrates, is it irreducible.

I am even more convinced of the unwisdom of reaching out to fashion a new "rule of reason," when this record is far from requiring it, because of the serious consequences it would portend for the general course of school desegrega-

---

7. For some extreme examples, see: School Board of Warren County v. Kilby, 259 F. 2d 497 (4th Cir. 1958) ; Corbin v. County School Bd. of Pulaski County, 177 F.2d 924 (4th Cir. 1949) ; Griffith v. Bd. of Educ. of Yancey County, 186 F. Supp. 511 (W.D.N.C.1960) ; Goins v. County School Bd. of Grayson County, 186 F.Supp. 753 (W.D.Va.1960), stay denied, 282 F.2d 343 (4th Cir. 1960). *See also*, Chambers v. Iredell Co., 423 F. 2d 613 (4th Cir. 1970) (dissenting opinion).

8. The majority calculates the elementary school portion of the plan to mean a 39% increase in bussed pupils, 32% increase in busses; the whole package, it is said, would require a 56% pupil increase and 49% bus increase.

These figures are accurate but do not tell the whole story. If one includes within the number of students presently being transported those that are bussed on commercial lines (5000) the increase in pupils transported would not appear to be as large. Thus the plan for elementary schools would entail a 33% bussed pupil increment, the whole Finger plan, 47%.

tion. Handed a new litigable issue—the so-called reasonableness of a proposed plan—school boards can be expected to exploit it to the hilt. The concept is highly susceptible to delaying tactics in the courts. Everyone can advance a different opinion of what is reasonable. Thus, rarely would it be possible to make expeditious disposition of a board's claim that its segregated system is not "reasonably" eradicable. Even more pernicious, the new-born rule furnishes a powerful incentive to communities to perpetuate and deepen the effects of race separation so that, when challenged, they can protest that belated remedial action would be unduly burdensome.

Moreover, the opinion catapults us back to the time, thought passed, when it was the fashion to contend that the inquiry was not how much progress has been made but the presence or absence of good faith on the part of the board. Whether an "intractable remnant of segregation" can be allowed to persist, apparently will now depend in large measure on a slippery test: an estimate of whether the Board has made "every reasonable effort to integrate the pupils under its control." [9]

9. Both in its characterization of the facts and in its treatment of the case the majority implies that the actions of this Board have been exemplary. I feel constrained to register my dissent from this view although on no account do I subscribe to the proposition that the disposition of the case depends on this issue.

On April 23, 1969 the District Judge declared the Charlotte-Mecklenburg School District illegally segregated. He found it unnecessary at that time to decide whether the Board had deliberately gerrymandered to perpetuate the dual system since he believed that the court order to follow would promote substantial changes. The Board was given until May 15 to devise a plan eliminating faculty and student segregation.

A majority of the Board voted not to take an immediate appeal and the school superintendent was directed to prepare a plan. His mandate was hazy. According to the court below—

No express guidelines were given the superintendent. However, the views of many members expressed at the meeting were so opposed to serious and substantial desegregation that everyone including the superintendent could reasonably have concluded, as the court does, that a "minimal" plan was what was called for, and that the "plan" was essentially a prelude to anticipate disapproval and appeal.

*    *    *    *    *

The staff were never directed to do any serious work on re-drawing of school zone lines, pairing of schools, combining zones, grouping of schools, conferences with the Department of Health, Education and Welfare, nor any of the other possible methods of making real progress towards desegregation.

The superintendent's plan was submitted to the Board on May 8. It was quite modest in its undertaking. Nevertheless, the Board "struck out virtually all the effective provisions of the superintendent's plan." The plan ultimately filed by the Board on May 28 was "the plan previously found racially discriminatory with the addition of one element—the provision of transportation for [majority to minority transfers.]" The Board also added a rule making a student who transfers to a new high school ineligible for athletics for a year. As the District Judge found,

[t]he effect of the athletic penalty is obvious—it discriminates against black students who may want to transfer and take part in sports, and is no penalty on white students who show no desire for such transfers.

In the meantime the Board for the first time refused to accept a recommendation of the superintendent for the promotion of a teacher to principal. The reason avowed was that the teacher, who was black and a plaintiff in the suit, had publicly expressed his agreement with the District Court order. The job was withheld until the prospective appointee signed a "loyalty oath."

The District Judge held a hearing on June 16 and ruled on June 20. He declined to find the Board in contempt but did note that "[t]he board does not admit nor claim that it has any positive duty to promote desegregation." The Judge also returned to the issue of gerrymandering and found "a long standing policy of control over the makeup of school population which scarcely fits any true 'neighborhood school philosophy.'"

On July 29, the Board returned with a new plan. The District Judge was pleased to learn that "the School Board has reversed its field and has accepted its affirmative constitutional duty to desegregate pupils, teachers, principals and

The Supreme Court having barred further delay by its insistent emphasis on an immediate remedy, we should not lend ourselves to the creation of a new loophole by attenuating the substance of desegregation.

ALBERT V. BRYAN, Circuit Judge (dissenting in part).

The Court commands the Charlotte-Mecklenburg Board of Education to provide busing of pupils to its public schools for "achieving *integration*". (Accent added.) "[A]chieving *integration*" is the phraseology used, but actually, achieving racial *balance* is the objective. Busing to prevent racial imbalance is not as yet a Constitutional obligation. Therefore, no matter the prior or present utilization of busing for this or other reasons, and regardless of cost considerations or duplication of the bus routes, I think the injunction cannot stand.

Without Constitutional origin, no power exists in the Federal courts to order the Board to do or not to do anything. I read no authority in the Constitution, or in the implications of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and its derivatives, requiring the authorities to endeavor to apportion the school bodies in the racial ratio of the whole school system.

The majority opinion presupposes this racial balance and also busing to achieve it, as Constitutional imperatives, but the Chief Justice of the United States has recently suggested inquiry on whether "any particular racial balance must be achieved in the schools; * * * [and] to what extent transportation may or must be provided to achieve the ends sought by prior holdings of the Court." See his memorandum appended to Northcross v. Board of Education of the Memphis, Tennessee, City Schools, 397 U.S. 232, 237, 90 S.Ct. 891, 893, 25 L.Ed.2d 246 (March 9, 1970.)*

staff members 'at the earliest possible date.'" In view of this declaration and of the late date, the court "reluctantly" approved for one year only a plan whereby seven all black inner-city schools would be closed and a total of 4245 black children bussed to outlying white schools. The Board was directed to file a plan for complete desegregation in November.

By November, the District Judge was able to survey the results achieved under the plan adopted for the year. He found that "only 1315 instead of the promised 4245 black pupils" had been transferred. (Later information revealed that the number was only 767.) Furthermore, he found that

> The Board has indicated that its members do not accept the duty to desegregate the schools at any ascertainable time; and they have clearly indicated that they intend not to do it effective in the fall of 1970. They have also demonstrated a yawning gap between predictions and performance.

On November 17, the Board filed a plan. It "discarded further consideration of pairing, grouping, clustering and transporting." Ostensibly "to avoid 'tipping,'" the plan provided that white students would not be assigned to schools where they would find themselves with less than 60% whites. This was, as the District Court found, a one-way street in view of

the fact that the plan contemplated no effort to desegregate schools with greater than 40% blacks. The plan also dropped the earlier provision of transportation for students transferring out of segregated situations. Thus the Board nullified the one improvement it had made in its May 8 plan. It also left those black students who had transferred to outlying schools pursuant to the July 29 plan without transportation. Understandably, the court labeled this "re-segregation."

In the face of this total lack of cooperation on the part of the Board, the court was compelled to appoint an expert to devise a plan for desegregation. The Finger plan was the result.

It appears from the record that on most issues the Board was sharply divided. Of course I mean to cast no aspersions on those members—and there were some —who urged the Board forthrightly to shoulder its duty. But the above recital of events demonstrates beyond doubt that this Board, through a majority of its members, far from making "every reasonable effort" to fulfill its constitutional obligation, has resisted and delayed desegregation at every turn.

* On remand the District Court in *Northcross* has held there was no Constitutional obligation to transport pupils to overcome a racial imbalance. Northcross v.

Even construed as only incidental to the 1964 Civil Rights Act, this legislation in 42 United States Code § 2000c-6 is necessarily revealing of Congress' hostile attitude toward the concept of achieving racial balance by busing. It unequivocally decried in this enactment "any order [of a Federal court] seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another * * * to achieve such racial balance * * *."

I would not, as the majority does, lay upon Charlotte-Mecklenburg this so doubtfully Constitutional ukase.

WINTER, Circuit Judge (concurring in part and dissenting in part).

I would affirm the order of the district court in its entirety.*

In a school district in which freedom of choice has patently failed to overcome past state policy of segregation and to achieve a unitary system, the district court found the reasons for failure. They included resort to a desegregation plan based on geographical zoning with a free transfer provision, rather than a more positive method of achieving the constitutional objective, the failure to integrate faculties, the existence of segregated racial patterns partially as a result of federal, state and local governmental action and the use of a neighborhood concept for the location of schools superimposed upon a segregated residential pattern. Correctly the majority accepts these findings under established principles of appellate review. To illustrate how government-encouraged residential segregation, coupled with the discriminatory location and design of schools, resulted in a dual system, the majority demonstrates that in this lo-

cality busing has been employed as a tool to perpetuate segregated schools.

In complete compliance with Carter v. West Feliciana School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970); Alexander v. Holmes County Bd. of Ed., 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969); Green v. School Bd. of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and Monroe v. Bd. of Com'rs, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968), the majority concludes that the existing high school and junior high school systems must be dismantled and that the constitutional mandate can be met by the use of geographical assignment, including satellite districts and busing.

The majority thus holds that the Constitution requires that this dual system be dismantled. It indicates its recognition of the need to overcome the discriminatory educational effect of such factors as residential segregation. It also approves the use of zones, satellite districts and resultant busing for the achievement of a unitary system at the high school and junior high school levels. Nevertheless, the majority disapproves a similar plan for the desegregation of the elementary schools on the ground that the busing involved is too onerous. I believe that this ground is insubstantial and untenable.

At the outset, it is well to remember the seminal declaration in Brown v. Board of Education (*Brown II*), 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), that in cases of this nature trial courts are to "be guided by equitable principles" in "fashioning and effectuating decrees." Since *Brown II* the course of decision has not departed from the underlying premise that this is an

---

Board of Education of the Memphis City Schools, 312 F.Supp. 1150 (W.D.Tenn., May 1, 1970) (per McRae, J.). In the same Circuit, see, too, Deal v. Cincinnati Board of Education, 419 F.2d 1387 (6 Cir. 1969).

* Certainly, if the district court's order with respect to high schools and junior high

schools is affirmed, the district court should not be invited to reconsider its order with respect to them. The jurisdiction of the district court is continuing and it may always modify its previous orders with respect to any school upon application and for good cause shown.

equitable proceeding, and that the district court is invested with broad discretion to frame a remedy for the wrongful acts which the majority agrees have been committed. In Green v. School Board of New Kent County, 391 U.S. at 438, 88 S.Ct. at 1694, 20 L.Ed.2d 716, the Supreme Court held that the district courts not only have the "power" but the "duty to render a decree which will, so far as possible, eliminate the discriminatory effects of the past, as well as bar like discrimination in the future." District courts were directed to "retain jurisdiction until it is clear that disestablishment has been achieved." Raney v. Board of Education, 391 U.S. 443, 449, 88 S.Ct. 1697, 1700, 20 L.Ed. 2d 727 (1968). Where it is necessary district courts may even require local authorities "to raise funds adequate to reopen, operate, and maintain without racial discrimination a public school system." Griffin v. County School Board, 377 U.S. 218, 233, 84 S.Ct. 1226, 1234, 12 L.Ed.2d 256 (1964). Thus, the Supreme Court has made it abundantly clear that the district courts have the power, and the duty as well, to fashion equitable remedies designed to extirpate racial segregation in the public schools. And in fashioning equitable relief, the decree of a district court must be sustained unless it constitutes a clear abuse of discretion. United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

Busing is among the panoply of devices which a court of equity may employ in fashioning an equitable remedy in a case of this type. The district court's order required that "transportation be offered on a uniform non-racial basis to all children whose attendance in any school is necessary to bring about reduction of segregation, and who live farther from the school to which they are assigned than the Board determines to be walking distance." It found as a fact, and I accept its finding, that "there is no way" to desegregate the Charlotte schools in the heart of the black community without providing such transportation.

The district court's order is neither a substantial advance nor extension of present policy, nor on this record does it constitute an abuse of discretion. This school system, like many others, is now actively engaged in the business of transporting students to school. Indeed, busing is a widespread practice in the United States. U. S. Commission on Civil Rights, Racial Isolation in the Public Schools 180 (1967). Between 1954 and 1967 the number of pupils using school transportation has increased from 9,509,699 to 17,271,718. National Education Association, National Commission on Safety Education, 1967–1968 Statistics on Pupil Transportation 3.

Given its widespread adoption in American education, it is not surprising that busing has been held an acceptable tool for dismantling a dual school system. In United States v. Jefferson County Board of Education, 380 F.2d 385, 392 (5 Cir.) (en banc), cert. den. sub nom. Caddo Parish School Bd. v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967), the court ordered that bus service which was "generally provided" must be routed so as to transport every student "to the school to which he is assigned" provided that the school "is sufficiently distant from his home to make him eligible for transportation under generally applicable transportation rules." Similarly, in United States v. School Dist. 151, 286 F.Supp. 786, 799 (N.D.Ill.1968), aff'd., 404 F.2d 1125 (7 Cir. 1968), the court said that remedying the effects of past discrimination required giving consideration to "racial factors" in such matters as "assigning students" and providing transportation of pupils. In addition, the Eighth Circuit in Kemp v. Beasley, 423 F.2d 851 (8 Cir. 1970), recognized that busing is "one possible tool in the implementation of unitary schools." And, finally, Griffin v. County School Board, *supra*, makes it clear that the added cost of necessary transportation does not render a plan objectionable.

I turn, then, to the extent and effect of busing of elementary school students as ordered by the district court.

Presently, 23,600 students—21% of the total school population—are bused, excluding some 5,000 pupils who travel to and from school by public transportation. The school board operates 280 buses. The average cost of busing students is $39.92 per student, of which one-half is borne by the state and one-half by the board. Thus, the average annual cost to the board is about $20.00 per student. The total annual cost to the board for busing is approximately $500,000.00 out of a total operating budget of $51,000,000.00. The cost of busing is thus less than 1% of the total operating budget and an even smaller percentage of the $57,700,000.00 which this school district expends on the aggregate of operations, capital outlay and debt service and this cost also represents less than 2% of the local funds which together with state and federal money constitute the revenue available annually to the school board.

The total number of elementary school pupils presently bused does not appear, but under the district court's order an additional 9,300 elementary school pupils would be bused. The additional operating cost of busing them would not exceed $186,000.00 per year. They would require not more than 90 additional buses, and the buses would require an additional capital outlay of $486,000.00. The increased operating cost of the additional elementary school pupils required to be bused amounts to less than 1% of the board's school budget, and the one-time capital outlays for additional buses amounts to less than 1% of the board's total budget. The combined operational and capital cost represents less than 1.2% of the board's total budget. I am, therefore, unable to see how the majority could consider the additional cost unbearable.

Perhaps more importantly, the tender years of elementary school students require a consideration of the impact of the district court's order on the average student. While this board transports 21% of the total school population, it is providing transportation to a far lower percentage of pupils than the average North Carolina school board. In North Carolina 54.9% of the average daily attendance in the public schools was transported by bus during the 1968–1969 school year.

The average distance traveled by elementary school pupils presently bused does not appear, but the district court found overall with respect to the children required to be bused by its order that they "will not as a group travel as far, nor will they experience more inconvenience than the more than 28,000 children who are already being transported * * *." While the district court did not make separate findings with regard to the average length of travel for the additional elementary school pupils required to be bused, it did find that the average one-way bus trip in the system today is over 15 miles in length and takes nearly an hour and a quarter. In contrast, the court found that under its plan the average one-way trip for elementary school students would be less than 7 miles and would require not over thirty-five minutes.

When I consider that busing has been widely used in this system to perpetuate segregation, that some busing was proposed even under the unacceptable board plans, that the cost of additional busing to the system as required by the court's order, both in absolute terms and in relation to its total expenditures is so minimal, and that the impact on the elementary school pupils is so slight, I discern no basis for concluding that the district court abused its discretion with respect to the elementary school.

Two other aspects of the majority's opinion require my comment.

First, the majority attempts to answer the query of the Chief Justice in his separate opinion in Northcross v. Board of Ed. of Memphis, 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246 (1970), as to whether "any particular racial balance must be achieved in the schools" by holding

"that not every school in a unitary school system need be integrated * * *." To me, the holding is premature and unwise. There is not in this case either the intractable problem of a vast urban ghetto in a large city or any substantial basis on which it may be said that the cost or the impact on the system or on the pupils of dismantling the dual system is insupportable.

The district court wisely attempted to remedy the present dual system by requiring that pupil assignment be based "as nearly as practicable" on the racial composition of the school system, 71% white and 29% black. The plan ordered fell short of complete realization of this remedial goal. While individual schools will vary in racial composition from 3% to 41% black, most schools will be clustered around the entire system's overall racial ratio. It would seem to follow from United States v. Montgomery County Board of Education, 395 U.S. 225, 232, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1968), that the district court's utilization of racial ratios to dismantle this dual system and remedy the effects of segregation was at least well within the range of its discretion. There the Supreme Court approved as a requirement of faculty integration that "in each school the ratio of white to Negro faculty members is substantially the same as it is throughout the system." It did so recognizing what it had previously said in New Kent County, 391 U.S. at 439, 88 S.Ct. at 1695, 20 L.Ed.2d 716, "[t]here is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance." If in a proper case strict application of a ratio is an approved device to achieve faculty integration, I know of no reason why the same should not be true to achieve pupil integration, especially where, as here, some wide deviations from the overall ratio have been permit-

ted to accommodate circumstances with respect to particular schools.

In addition to *Montgomery*, the same conclusion can be deduced from the mandate of *West Feliciana* and *Holmes County* to dismantle immediately a dual system. Schools cease to be black or white when each reflects the overall pupil racial balance of the entire system. What imbalances may be justified after a unitary system has once been established, and what departures from an overall accommodate special circumstances in pupil racial balance may be permitted to basis and the facts of record which each case presents.

The other aspect of the majority's opinion which troubles me greatly is its establishment of the test of reasonableness. My objections to this test do not spring from any desire to impose *un*reasonable, irrational or onerous solutions on school systems; I, too, seek "reasonable" means with which to achieve the constitutionally required objective of a unitary system.

My objections are two-fold.

First, this is an inappropriate case in which to establish the test. On this record it cannot be said that the board acted reasonably or that there is any viable solution to the dismantling of the dual system other than the one fashioned by the district court. Neither the board nor HEW has suggested one. So that, again, I think the majority is premature in its pronouncement and I would find no occasion to discuss reasonableness when there is no choice of remedies.

Second, the majority sets forth no standards by which to judge reasonableness or unreasonableness. The majority approves the district court's plan as to high schools and junior high schools, yet disapproves as to elementary schools. The only differences are increased busing with attendant increased cost, time and distance. The majority subjectively concludes that these costs are too great to permit the enforcement of the constitutional right to a unitary system. I would find them neither prohibitive nor

relatively disproportionate. But, with the absence of standards, how are the school boards or courts to know what plans are reasonable? The conscientious board cannot determine when it is in compliance. The dilatory board receives an open invitation to further litigation and delay.

Finally, I call attention to the fact that "reasonableness" has more than faint resemblance to the good faith test of *Brown II*. The 13 years between *Brown II* and *New Kent County* amply demonstrate that this test did not work. Ultimately it was required to be rejected and to have substituted for it the absolute of "now" and "at once." The majority ignores this lesson of history. If a constitutional right exists, it should be enforced. On this record the constitutional rights of elementary school pupils should be enforced in the manner prescribed by the district court, because it is clear that the district court did not abuse its discretion.

Judge Sobeloff authorizes me to say that he joins in these views.

## JUDGMENT

This cause came on to be heard on the record from the United States District Court for the Western District of North Carolina, and was argued by counsel.

On consideration whereof, it is ordered and adjudged that the judgment of the District Court appealed from, in this cause, be, and the same is hereby, vacated; and the case is remanded to the United States District Court for the Western District of North Carolina, at Charlotte, for further proceedings.

Judge Bryan joins Haynsworth, C. J., and Boreman, J., in voting to vacate the judgment of the District Court, and to remand the case in accordance with the opinion written by Butzner, J. He does so for the sake of creating a clear major-

ity for the decision to remand. It is his hope that upon reexamination the District Court will find it unnecessary to contravene the principle stated in Judge Bryan's dissent herein, to which he still adheres. Screws v. United States, 325 U.S. 91, 135, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945).