434 F.2d 408
 Carlotta Mozelle BREWER et al., Appellants,
v.
The SCHOOL BOARD OF the CITY OF NORFOLK, VIRGINIA et al., Appellees.
UNITED STATES of America, Appellant,
v.
The SCHOOL BOARD OF the CITY OF NORFOLK, VIRGINIA et al., Appellees.
 No. 14544.
 No. 14545.
 United States Court of Appeals, Fourth Circuit.
 Argued June 5, 1970.
 Decided June 22, 1970.
 Certiorari Denied June 29, 1970.
 
 See 90 S.Ct. 2247.
 Henry L. Marsh, III, Richmond, Va. (S. W. Tucker, Richmond, Victor J. Ashe, J. Hugo Madison, Norfolk, Va., Louis R. Lucas, Memphis, Tenn., Jack Greenberg, James M. Nabrit, III, and Norman J. Chachkin, New York City, on the brief), for appellants in No. 14,544.
 J. Harold Flannery, Atty., Department of Justice (Jerris Leonard, Asst. Atty. Gen. of the United States, David L. Norman, Deputy Asst. Atty. Gen., and Charles K. Howard, Jr., Atty., Department of Justice, on the brief), for appellant in No. 14,545.
 Toy D. Savage, Jr., Norfolk, Va. (Allan G. Donn and Willcox, Savage, Lawrence, Dickson & Spindle, and Leonard H. Davis, Norfolk, Va., for City of Norfolk, on the brief), for appellees.
 Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN, WINTER, CRAVEN, and BUTZNER, Circuit Judges, sitting en banc.
 BUTZNER, Circuit Judge:
 
 
 1
 The United States and parents of black pupils attending the Norfolk, Virginia, public schools appeal from an order of the district court approving the Norfolk School Board's long-range plan for the creation of a unitary school system.[1] Because this plan does not meet the constitutional requirements stated in Green v. County School Bd. of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and Alexander v. Holmes County Bd. of Ed., 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969), we reverse and remand for further proceedings.
 
 
 2
 Approximately 56,600 pupils, of whom 32,600 are white and 24,000 are black, attend the Norfolk schools. During the 1969-70 school year the board operated five senior high schools. One of these was all black, and more than half of Norfolk's black high school pupils attended it. The other four had enrollments ranging from 9% to 53% black.
 
 
 3
 Of the eleven junior high schools, five enrolled about 77% of the district's black junior high pupils. Four of these schools were virtually all black and one was 91% black. At the other extreme, three junior high schools were 92% to 97% white. The remaining three schools had black enrollments of 12%, 16%, and 54%.
 
 
 4
 The district had 55 elementary schools. Eighty-six per cent of the black pupils attended twenty-two schools which were more than 92% black. In contrast, 81% of the white pupils attended twenty-five that were more than 92% white. The remaining eight schools had student bodies from 10% to 75% black.
 
 
 5
 During the 1969-70 school year, most of the schools could be racially identified by the composition of their faculties. At only two of the seventy-three schools did the assignment of faculty reflect the racial composition of the district's teachers, which is approximately 34% black and 66% white. Throughout the district only 16% of the teachers were assigned across racial lines.
 
 
 6
 The evidence clearly depicts a dual system of schools based on race. To remedy the situation the school board has devised a plan that will assign elementary pupils according to geographic zones. In turn, pupils from selected elementary schools will be assigned to junior high schools through a feeder system. For the immediate future, the board plans to retain the present high school assignments. At a later date, a new high school, projected for the 1972-73 school year, will be used to completely desegregate all high schools by the use of noncontiguous zones and transportation.
 
 
 7
 The school board drew its zones so that, with negligible exceptions, each school attended by white pupils will have a majority of whites. The board aimed for a 70% white majority, but accepted 60% as a minimum.[2] The board justifies this method of assignment by a series of principles which the district court found to be supported by the evidence. Briefly, these principles postulate: pupils tend to do better in schools with a predominantly middle class milieu; white pupils generally are middle class, and black pupils generally are in a lower socio-economic class; therefore, to maintain a predominantly middle class milieu, a school must have a clear majority of white children. Assignments according to these principles, the board's experts said, will enable black pupils to show substantially higher achievement than they would in all black or predominantly black schools. On the other hand, white pupils will achieve as well as they did in all white schools and better than they would in predominantly black schools. Retention of white majorities in each desegregated school, the board argues, will stabilize the system and prevent middle class flight from the city.
 
 
 8
 The board's plan will leave nineteen elementary schools all-black. Approximately 76% of the black elementary pupils will attend these all-black schools. In contrast, almost 40% of the white elementary pupils will be assigned to ten all-white elementary schools and to an eleventh that will be 98% white. Only twenty of the fifty-two[3] elementary schools the district proposes to operate will have student bodies that are 10% to 40% black. In only two elementary schools attended by white pupils has the board deviated from its doctrine that white pupils must comprise at least 60% of the enrollment.
 
 
 9
 The board proposes to assign 57% of all black pupils to three junior high schools whose student bodies will be 98% to 100% black. One junior high school will remain all-white, and six will approximate the board's quota by having black enrollments of 10% to 45%.[4]
 
 
 10
 The appellants vigorously challenge the data which underlie the board's principles of assignment. But we need not discuss in detail the arguments for and against the validity of the doctrine the board espouses. Creation of predominantly middle class schools in a district where all pupils would be assigned to them may be unobjectionable. But here many of the schools will not be middle class, and, by the board's own standards, they will be inferior. The board's rigid adherence to its quota, without making available to all students the benefits it perceives, preserves the traditional racial characteristics of its schools. White schools remain predominantly white; black schools remain black. Application of the board's principles of assignment for elementary and junior high schools fails to create a unitary school system in Norfolk. Instead, it effectively excludes many black pupils from integrated schools on account of their race, a result which is the antithesis of a racially unitary system. Alexander v. Holmes County Bd. of Ed., 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969).
 
 
 11
 In Nesbit v. Statesville City Bd. of Ed., 418 F.2d 1040 (4th Cir. 1969), and Stanley v. Darlington County School Dist., 424 F.2d 195 (4th Cir.), cert. denied, 398 U.S. 909, 90 S.Ct. 1690, 26 L. Ed.2d 67 (1970), following the teaching of Alexander v. Holmes County Bd. of Ed., 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969), and Carter v. West Feliciana Parish School Bd., 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 474 (1970), we held that school boards must terminate their dual school systems at once. Nevertheless, the board proposes to continue Booker T. Washington as a virtually all-black school for several years until a new school is built. Alternative plans for immediately desegregating it are suggested by the record. Similarly, in Statesville and Darlington, we directed that school boards provide for the immediate and complete integration of faculties. But not until the school year beginning September 1971 does the board plan to assign faculty to reflect the overall racial composition of the district's teaching staff. We find in this record no justification for postponing desegregation of Booker T. Washington high school, or for continuing for another year the racial identity of many other schools by faculty assignments.
 
 
 12
 We remand to the district court with these instructions:
 
 
 13
 The district court shall direct the school board to submit a plan for unitary schools on or before July 27, 1970. The plan may be based on suggestions made by the government's expert witness, Dr. Michael J. Stolee, or on any other method that may be expected to provide a unitary school system. The plan should immediately desegregate all high schools. With respect to elementary and junior high schools, the board should explore reasonable methods of desegregation, including rezoning, pairing, grouping, school consolidation, and transportation. Green v. School Bd. of City of Roanoke, 428 F.2d 811 (4th Cir. 1970).
 
 
 14
 If it appears that black residential areas are so large that not all schools can be integrated, the school board must take further steps to assure that no pupil is excluded because of his race from a desegregated school. The board should make available to pupils in the black schools special classes, functions, and programs on an integregated basis, and it should assign these pupils to integrated schools for a substantial portion of their school careers. Cf. Singleton v. Jackson Municipal Separate School System, 426 F.2d 1364 (5th Cir. 1970).
 
 
 15
 The school board must amend its transfer provision to freely allow majority to minority transfers and provide transportation by bus or common carrier so individual pupils can leave black schools. Without such provision as Judge Matthes pointed out in Clark v. Bd. of Ed. of the Little Rock School Dist., 426 F.2d 1035, 1044 (8th Cir. 1970), a majority to minority transfer plan is an illusory remedy. The limitation that would allow black pupils to transfer only to a school which has less than 30% of their race must be removed because it unduly restricts the schools to which these pupils can transfer. Swann v. Charlotte-Mecklenburg Bd. of Ed., 431 F.2d 138, 142 (4th Cir. 1970).
 
 
 16
 The plan must include provisions for the integration of faculties so that in each school the racial ratio shall be approximately the same as the ratio throughout the system. The board, however, may make exceptions for specialized faculty positions. Nesbit v. Statesville City Bd. of Ed., 418 F.2d 1040, 1042 (4th Cir. 1969).
 
 
 17
 Exceptions to the plan, if any, may be filed on or before August 3rd.
 
 
 18
 The district court should promptly conduct a hearing to enable it to determine the effectiveness of the proposed plan and to consider any exceptions. It shall then enter an order approving a plan for a unitary school system and requiring its implementation in September 1970. The plan shall remain in full force and effect, regardless of appeal, unless it is modified by an order of this court. Green v. School Bd. of City of Roanoke, 428 F.2d 811 (4th Cir. 1970).
 
 
 19
 Judge BOREMAN dissents and other judges reserve the right to express their views in concurring opinions.
 
 
 20
 Let the mandate issue forthwith.
 
 
 21
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 Beckett v. School Bd. of the City of Norfolk, 302 F.Supp. 18 and 308 F.Supp. 1274 (E.D.Va.1969)
 
 
 [2]
 The Superintendent of Schools testified:
 "[W]hen you go to draw a line, you try to — within that elementary map that is posted here, you try to — create as much good desegregation as you can. So there it goes; but if you draw the line and you see you get a 60% Negro school and you say, `Principle Number So-and-so — that says 40% is the maximum,' then you change the line. So that is what I mean. They're used as guidelines in drawing the map,"
 In practice the guidelines, or principles, effectively exclude black pupils from desegregated schools. For example, all-black Monroe elementary school must accommodate 75 students over its capacity, while the adjacent formerly white Stuart elementary school will have a maximum permissible enrollment of 40% black pupils and 295 vacant desks. The schools are not far apart. A convenient bus line runs through both zones.
 
 
 [3]
 The board plans to reduce the number of elementary schools from 55 to 52
 
 
 [4]
 The projected attendance of pupils — expressed in percentages by race — is necessarily an estimate. The board suggests that estimates of the percentage of black pupils who will attend desegregated schools should be increased because of population shifts and transfers. But in any event, the board envisions that less than half of the black elementary pupils and only two-thirds of the black junior high school pupils will attend desegregated schools. The appellants believe the attendance will be considerably less
 
 
 
 22
 ALBERT V. BRYAN, Circuit Judge (specially concurring):
 
 
 23
 With reluctance but still with genuine admiration for the author's work, I concur in the majority opinion. The District Judge, and the School Board he upholds, have been dedicated in a desire to effectuate in fairness the precepts of the Brown decision. They have sought to integrate the schools, and in this effort to establish a plan which would use integration to its best advantage in education.
 
 
 24
 This effort has spanned many years, and occupied to the uttermost the knowledge of an experienced Board and the advice of a Federal judge, widely and thoroughly informed in the geographical and demographical circumstances of Norfolk. I would reverse only because the plan incorporates distinctions based on race, heretofore declared to be unconstitutional.
 
 
 25
 Specifically, they are requirements that attendance in schools be fixed by racial percentages, and a declaration that white majorities should prevail because pupils tend to do better in a predominantly middle class milieu, and the observation that white pupils generally are middle class and black pupils in lower socio-economic class.
 
 
 26
 Utilization of these concepts, even if assumed to be sound scholastically, and although adopted bona fide by the Board and the Court as innovations to better the offerings of public education, cannot stand against the peremptory decrees of Brown and its procreations. No fault can be found in the majority's reiteration and exposition of the law to this effect, both as to pupils and faculty.
 
 
 27
 My concern is that the remand lacks guidance to the District Judge on what he may or should do now. To this end I express the belief that the expertise of the Board and the seasoned judgment of the District Court can formulate a design — not impinging Brown — consisting of ungerrymandered neighborhood schools supplemented by freedom of choice and other pertinent factors. Freedom of choice was not outlawed in Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). The Court said:
 
 
 28
 "We do not hold that a `freedom-of-choice' plan might of itself be unconstitutional, although that argument has been urged upon us. Rather, all we decide today is that in desegregating a dual system a plan utilizing `freedom of choice' is not an end in itself. * * *" 391 U.S. at 439-440, 88 S.Ct. at 1695.
 
 
 29
 This feature, I believe, when employed in company with other factors will avoid disobedience of Brown, if the combination is reasonably necessary because of special circumstances.
 
 
 30
 Accordingly, on account of the peculiar layout of residential Norfolk, I think the neighborhood school plan there would be altogether valid if supplemented by the freedom of choice privilege and provision for transportation, at the expense of the school authorities, wherever transportation is needed to make the schools accessible to the neighborhood pupils or to those exercising their freedom of choice of other schools. Transportation to effect a racial balance of attendance would not be required.
 
 
 31
 Integration could in this way be achieved to a point satisfying Brown — that is a system "within which no person is to be effectively excluded from any school because of race or color". Alexander v. Holmes County Bd. of Ed., 396 U.S. 19, 20, 90 S.Ct. 29, 30, 24 L.Ed.2d 19 (1969). The same pattern could be adapted to the high schools both junior and senior. Teachers would be assigned among the schools without regard to race wherever the school is located.
 
 
 32
 At least the proposed design is equitable, and I think the remand should specifically include it as a possibility. Ellis v. Board of Public Instruction of Orange Co., Florida, 423 F.2d 203, 207 (5 Cir. 1970).
 
 
 33
 SOBELOFF and WINTER, Circuit Judges (concurring specially):
 
 
 34
 Because of the deficiencies in the School Board's plan, as pointed out in the opinion of the court, we concur in the order reversing the judgment of the District Court and remanding the case.
 
 
 35
 We do so without relinquishing the views we expressed in our separate opinions in Swann v. Charlotte-Mecklenburg, 431 F.2d 138 (4th Cir. 1970). As we stated in that case the constitutional rights of the plaintiffs cannot be made to depend on an appraisal of the "reasonableness" of desegregating.
 
 
 36
 On remand the plain duty of the District Court will be to require the Board to present a plan that realistically is effective to undo the existing segregation in the Norfolk school system.* We have seen no indications that complete accomplishment of this task will be either "infeasible," our test in Swann, or "unreasonable," the plurality's standard in that case.
 
 
 37
 The District Court should not tolerate any new scheme or "principle," however characterized, that is erected upon and has the effect of preserving the dual system. This applies to the "neighborhood school" concept, a shibboleth decisively rejected by this court in Swann (Judge Bryan dissenting), as an impediment to the performance of the duty to desegregate. The purely contiguous zoning plan advanced by the Board in that case was rejected by five of the six judges who participated. A new plan for Norfolk that is no more than an overlay of existing residential patterns likewise will not suffice.
 
 
 38
 Finally, we must disassociate ourselves from the undeserved blessing conferred on the Board by our brother Bryan. This litigation has been frustratingly interminable, not because of insuperable difficulties of implementation but because of the unpardonable recalcitrance of the defendants. The new, and spurious, "principles" devised by the Board and endorsed by the Judge as justification for the failure to desegregate fly in the face of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and are simply new rationalizations for perpetuating illegal segregation.
 
 
 
 Notes:
 
 
 *
 This can be most expeditiously achieved by pursuing and implementing Dr. Stelee's suggested approach