**Carolyn BRADLEY, etc., et al.**

v.

**The SCHOOL BOARD OF the CITY OF RICHMOND, VIRGINIA, et al.**

**Civ. A. No. 3353–R.**

United States District Court,
E. D. Virginia,
Richmond Division.
May 26, 1971.

Norman J. Chachkin, New York City, Louis R. Lucas, Memphis, Tenn., M. Ralph Page, James R. Olphin, Richmond, Va., for plaintiffs.

George B. Little, John H. O'Brion, Jr., James K. Cluverius, for defendants Superintendent of Schools and School Board of the City of Richmond.

Andrew P. Miller, Atty. Gen. of Virginia, William G. Broaddus and D. Patrick Lacy, Jr., Asst. Attys. Gen., for defendants State Board of Education and Superintendent of Public Instruction.

Robert D. McIlwaine, III, Petersburg, Va.; J. Mercer White, Jr., County Atty., for Henrico County, L. Paul Byrne, Richmond, Va., for defendants School Board and Board of Supervisors of Henrico County.

J. Segar, Gravatt, Blackstone, Va., for defendant School Board of Chesterfield County.

Oliver D. Rudy, Commonwealth's Atty. for Chesterfield County, Frederick T. Gray, Walter E. Rogers, Richmond, Va., for Board of Supervisors of Chesterfield County.

Everette G. Allen, Jr., Richmond, Va., for intervenors Bellevue-Ginter Area Civic Ass'n, Robert Douglas Bain, and Sherwood Park Civic Ass'n.

Frederick T. Gray, Walter E. Rogers, Richmond, Va., for intervenors Noel Austin and others.

John S. Battle, Jr., William H. King, Jr., Richmond, Va., for intervenors Westover Hills Parent-Teachers Ass'n.

## MEMORANDUM

MERHIGE, District Judge.

This class action, brought sixteen years ago in an effort to end racial discrimination in the operation of public schools in Richmond, Virginia, is before the Court on a motion for attorneys' fees. An appropriate ruling on the pending motion requires an abridged review of events since March of 1970.

On March 10, 1970, a motion for further relief was filed in this case, and after extensive hearings this Court ordered into effect an interim desegregation plan prepared by the School Board for the school year 1970–71, Bradley v. School Board of City of Richmond, 317

F.Supp. 555 (E.D.Va.1970), and later, a plan for 1971–72, *Id.*, 325 F.Supp. 828 (E.D.Va.1971). Appended to the motion for further relief was an application for an award of reasonable attorneys' fees, to be paid by the City School Board. In light of the defendants' conduct before and during litigation, and by reason of the unique character of school desegregation suits, justice requires that fees should be awarded.

This case lay dormant from 1966 until the motion of March, 1970. During that period the city schools were operated under a free choice system of pupil assignment. The plan was approved by the court of appeals, Bradley v. School Board of City of Richmond, 345 F.2d 310 (4th Cir. 1965), but the case was remanded for further hearings on faculty assignments by the Supreme Court, Bradley v. School Board of the City of Richmond, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965). After some further district court proceedings the case lay idle until 1970.

When the suit was reactivated the defendants were directed, pursuant to this Court's usual practice in school desegregation cases, to state on the record whether they contended that the schools were then operating as a unitary system, and, if not, what period of time would be required to formulate a constitutional plan. In open court, albeit reluctantly, the defendants admitted that the Constitution was not being complied with[1]; they were ordered on April 1, 1970, to submit a unitary plan on or before May 11, 1970. Hearings were set for June, and the parties were admonished as to the necessity of implementing a unitary plan in the fall of 1970.

The Court will not restate its findings of fact and conclusions of law which resulted from the hearings of the summer of 1970; these are adquately covered in the reported decision. A few points relevant to the present motion should be stressed.

Although the School Board had stated, as noted, that the free choice system failed to comply with the Constitution, producing as it did segregated schools, they declined to admit during the June hearings that this segregation was attributable to the force of law (transcript, hearing of June 20, 1970, at 322). Hearings which the Court had hoped would be confined to the effectiveness of a plan of desegregation consequently were expanded; the plaintiffs were put to the time and expense of demonstrating that governmental action lay behind the segregated school attendance prevailing in Richmond. Public and private discrimination were shown to lie behind the residential segregation patterns over which the School Board proposed to draw neighborhood school zone lines. Evidence on choice of school and public housing sites, restrictive covenants in deeds, discrimination in federal mortgage insurance opportunities, housing segregation ordinances, and continued practice of private discrimination was presented, most of it without cross-examination or serious attempt at refutation. All of this proof was clearly relevant, not only under Swann v. Charlotte-Mecklenburg Board of Education, *supra*, 431 F.2d at 141, decided just prior to the hearings, but also under Brewer v. School Board of City of Norfolk, 397 F.2d 37, 41 (4th Cir. 1968).

---

1. Of course, it scarcely excuses the School Board's continued operation under an invalid plan that they were under an outstanding court order to do so. Legal requirements change; what is consistent, moreover, with a pace of deliberate speed at one time should not be confused with the ultimate goal. The school system was in violation of outstanding authoritative decisions, Swann v. Charlotte-Mecklenburg Board of Education, 431 F.2d 138, 141 (4th Cir. 1970), rev'd in part 401 U.S. 1, 91 S.Ct. 1267, 28 L.Ed. 2d 554 (1971). To await the plaintiffs' initiation of legal action may have seemed a wise strategic choice, but it cannot be equated with the fulfillment of the affirmative duty to desegregate.

At the same hearings the School Board presented a desegregation proposal developed by a team from the Department of Health, Education and Welfare that was obviously unacceptable under law then current. It is hard to see how the Board could have contended otherwise, for its proposals achieved very little desegregation beyond what prevailed under the free choice system, which it had rightly declined to defend. These hearings were held more than two years after Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) was handed down. Since that time it has been clear that compliance with the Constitution is not measured by the formal racial neutrality of a pupil assignment plan but rather by its effectiveness in extinguishing the public policy of segregation. Freedom of choice had left three of seven high schools all black and one nearly all white. It left five junior high schools out of eleven all black or nearly so and two nearly all white. Of forty-four elementary schools twenty-two were substantially all black and eight almost all white, with several others containing a significant but still grossly disproportionate Negro enrollment. The School Board's desegregation proposal—the HEW plan—would have placed small minorities of the opposite race in the three formerly black high schools and would have left the white high school unchanged. Three junior high schools would have remained as obviously black facilities, and there would have been two clearly white and five almost 100% white and fifteen nearly all black elementary schools. Many other elementary schools could not strictly have been called all black or all white, but departed substantially from the systemwide ratio and would be readily identifiable racially.[2]

Not only did the results of the School Board proposal condemn it, but also it failed to pass legal muster because those who prepared it were limited in their efforts further to desegregate by self-imposed restrictions on available techniques. Consideration of residential segregation in drawing zone lines was omitted, except that it was decided at a late date to pair a few schools; transportation was not seriously considered as a desegregation tool, and in general, astonishingly, race was not taken into account in the formulation of the plan. Since 1966 it has been plain that school boards in this circuit may consider race in preparing zone plans. Wanner v. County School Board of Arlington County, 357 F.2d 452 (4th Cir. 1966). To bar this key factor from discussion would render impossible almost the first step in the Board's task of disestablishing the dual system. For failure to address itself to the legal duty imposed upon it by *Green,* that of taking affirmative action to desegregate, the plan was manifestly invalid. Furthermore, *Swann* held that busing and satellite zoning were legitimate integration techniques. Swann v. Charlotte-Mecklenburg Board of Education, *supra,* 431 F. 2d at 145–146. A plan that failed even to experiment with these legitimate tools and yet left such substantial segregation should never have been proposed to the Court.

The School Board was directed to submit a further plan within a month's time, and hearings were held on the second proposal. At the conclusion of the June proceeding the Court had specifically called the parties' attention to recent appellate rulings fixing the extent of their obligation: Brewer v. School Board of City of Norfolk, 434 F.2d 408 (4th Cir.) cert. denied 399 U.S. 929, 90 S.Ct. 2247, 26 L.Ed.2d 796 (1970); Green v. School Board of City of Roanoke, 428 F.2d 811 (4th Cir. 1970); United States v. School Board of Franklin City, 428 F.2d 373 (4th Cir. 1970);

---

2. A full tabulation of the results projected under the HEW plan is given in Bradley

v. School Board of the City of Richmond, *supra,* 317 F.Supp. at 564–565.

Swann v. Charlotte-Mecklenburg Board of Education, *supra*, 431 F.2d 138. Under these precedents the School Board's second plan also failed to establish a unitary school system. Its deficiencies are fully treated in the Court's earlier opinion[3]; the most glaring inadequacy is the large proportion of elementary students placed in substantially segregated schools. The Fourth Circuit in *Swann* rejected an elementary plan which left over half the black elementary students in 86% to 100% black schools and about half the whites in 86% to 100% white schools. In the face of that ruling the School Board proposed a plan under which 8,814 of 14,943 black elementary pupils would be in twelve elementary schools over 90% black, and 4,621 of 10,296 white elementary pupils would attend seven 90% or more white schools. At the same time, although testimony in the June hearings by school administrators indicated a consensus that desegregation of such schools could not be achieved without transporting students, the School Board had in August still taken no steps to acquire the necessary equipment. Because by that time it was too late to do so by the beginning of the 1970–71 school year, the plaintiffs were forced to accept only partial relief in the form of the School Board's inadequate plan on an interim basis.

The order approving that plan included a direction to the defendants to report to the Court by mid-November the specific steps taken to create a unitary system and to advise the Court of the earliest date such a system could be put into effect.

Appeals were noted by all parties, but efforts by the City Council to secure a stay, pursued at all levels, failed. On motion of the School Board, however, briefing was postponed by the Court of Appeals pending rulings by the Supreme Court on school desegregation cases then before that court. The effect of that order was to stay all appellate proceedings.

The School Board's November report stated only that three further desegregation plans were in preparation and would be submitted on January 15, 1971. These proposals were to be based on various assumptions concerning the Supreme Court's disposition of the cases before it.

In the meantime the School Board sought relief from the Court's outstanding order enjoining planned school construction. Depositions of expert witnesses were taken and the matter was submitted on briefs. The evidence disclosed that the School Board had not seriously reviewed the site and capacity decisions which it had made, according to earlier testimony, without consideration of their impact on efforts to desegregate. Rather it was reportedly determined that the sites chosen were compatible with various conceivable measures of the affirmative duty to desegregate, none of which was consistent with current decisions. Bases for the conclusions of compatibility, moreover, were not presented. The Court declined to lift the construction injunction. Bradley v. School Board of City of Richmond, 324 F.Supp. 456 (E.D.Va.1971).

In December, prior to consideration of the school construction issue, the plaintiffs moved for further relief effective during the second semester of the 1970–71 school year, stating that the defendants' report indicated that they did not intend further desegregation efforts during the current year. The promised plans were filed in January.[4] The only proposal which promised more than an insubstantial advance over the inadequate interim plan, the School Board's Plan 3, required the purchase of trans-

---

3. Bradley v. School Board of the City of Richmond, *supra*, 317 F.Supp. at 572–576.

4. They are described in this Court's prior opinion, Bradley v. School Board of City of Richmond, 325 F.Supp. 828 (E.D.Va. 1971).

portation facilities which the School Board still would only say it would acquire if so ordered. In its November report the Board stated firmly its opposition to any mid-year modifications of the plan.

The Court declined to order further mid-year relief, Bradley v. School Board of City of Richmond, 324 F.Supp. 456 (E.D.Va.1971). Because of the nearly universal silence at appellate levels, which the Court interpreted as reflecting its own hope that authoritative Supreme Court rulings concerning the desegregation of schools in major metropolitan systems might bear on the extent of the defendants' duty, the Court felt that it would not be reasonable to require further steps to desegregate during the second semester, and particularly so in view of the expense of such steps and the likelihood that they could not become effective, on account of the delay in acquiring transportation facilities, until late in that semester. The fact remains, nonetheless, that the School Board had made effective and immediate further relief nearly impossible because it had not taken the specific step of seeking to acquire buses. This policy of inaction, until faced with a court order, is especially puzzling in view of representations later made by counsel for the School Board to the effect that at least fifty-six bus units would have to be bought, in the Board's view, in order to operate under nearly any possible plan during the 1971–72 school year.

Finally, the Court heard further evidence on the plan to be implemented during 1971–72.[5] The School Board, as noted, offered three plans;[6] one only, as stated, would work to eliminate the substantial segregation that remained in Richmond schools. Plan 1 was a strictly contiguous geographic zoning system. Plan 2, at the elementary level, suffered from the same faults which had condemned the school administration's plan in *Swann* and the interim plan in this case. Plan 3 substantially eliminated the racial identifiability of numerous elementary facilities. But, although the Board prepared that plan, they did not urge its adoption but instead endorsed plan 2 for the 1971–72 school year. At the hearings, counsel for the School Board again stated that no further transportation units would be acquired unless the Court so ordered specifically, despite that the Court had found in August of 1970 that the interim plan did not achieve a sufficient level of desegregation and could be approved as a temporary expedient only in view of the lack of equipment necessary for further desegregation. The Court directed the adoption of plan 3 for the upcoming school year.

■ As a very general statement of the law, it is true that American courts do not reimburse the victorious litigant for the full price of his victory, his attorney's fees and expenses. See Goodhart, Costs, 38 Yale L.J. 849 (1929). Like most generalizations in law, this rule is subject to several exceptions. The shape of these exceptions provides an example of the tensions existent in our system between two sources of legal rules: courts and legislatures. For the cases show that courts recognize a power in themselves, necessary at times in order fully to achieve justice, to direct that a losing litigant pay his opponent's attorney's fees. This power, if it has a statutory source at all, is conferred implicitly in the grant of equitable jurisdiction. At the same time legislative directives sometimes provide that a

---

5. The instant motion seeks only fees and expenses for litigation to January 29, 1971, but evidence of subsequent behavior of the defendants is relevant in that it tends to show a consistent policy, pursued at all stages of the case.

6. Details of the proposals are given in Bradley v. School Board of City of Richmond, 325 F.Supp. 828 (E.D.Va.1971).

court may or must award a winning plaintiff reasonable counsel fees. Such statutes, not infrequently, form part of a more extensive legislative scheme which creates a legal right and the appropriate remedy for its violation. It is not difficult to see how legal doubts may arise as to the court's power in a certain case to direct the payment of fees. Most federal cases involve the vindication of statutory rights. In certain cases the question arises whether Congress, in omitting from legislation any provision for the award of counsel fees, intended to impose a restriction on available relief or intended instead to permit the courts to exercise the power resting in them under existing decisions. Conversely, where a fee award is specifically authorized, the question arises whether some different factual showing from that required under general equitable principles supports an award.

The plaintiffs do not argue that explicit statutory authorization exists for an award of counsel fees. The case is brought pursuant to 42 U.S.C. § 1983 and this Court's general equitable power to enforce constitutional protections; Congress has not mandated that judgments on such cases should as a matter of ordinary course include the payment of counsel fees. Williams v. Kimbrough, 415 F.2d 874 (5th Cir. 1969), cert. denied, 396 U.S. 1061, 90 S.Ct. 753, 24 L.Ed.2d 755 (1970).

The case therefore presents an issue to be resolved on the basis of principles governing this Court's general equitable discretion, if discretionary power is available to the Court in matters of this nature. In seeking out whatever particular or special circumstances justify an award of attorney's fees, the Court must be mindful that this case should be compared not solely with other cases concerning school desegregation, but with all other types of litigation as well.

■ Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L. Ed. 1184 (1939), establishes that counsel fees and other litigation expenses, not taxable as costs by statute, may be awarded as part of a litigant's relief. "Allowance of such costs in appropriate situations is part of the historic equity jurisdiction of the federal courts," *Id.*, 164, 59 S.Ct. 779. One circumstance in which an award may be an appropriate use of the power of equity is that in which an individual litigant by his activities creates or preserves a fund in which others than he may have an interest.[7] *Sprague* was such a case, in effect, but the Court in that decision declined to limit the equity court's power to any particular circumstances. "As in much else that pertains to equitable jurisdiction, individualization in the exercise of a discretionary power will alone retain equity as a living system and save it from sterility * * *. In any event such allowances are appropriate only in exceptional cases and for dominating reasons of justice," *Id.*, 167, 59 S.Ct. 780.

Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967), stresses that the principles allowing awards of counsel fees have no application in cases involving "statutory causes of action for which the legislature had prescribed intricate remedies," *Id.*, 719, 87 S.Ct., not intended by Congress to include the payment of counsel fees. *Fleischmann* has, however, been followed by Newman v. Piggie Park Enterprises, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968), and Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). In *Newman*, an action under

---

7.  See, *e. g.*, Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157 (1881) ; Kahan v. Rosenstiel, 424 F.2d 161 (3d Cir.) cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970) ; Gibbs v. Blackwelder, 346 F.2d 943 (4th Cir. 1965) ; Mercantile-Commerce Bank v. Southeast Arkansas Levee District, 106 F.2d 966 (8th Cir. 1939).

the 1964 Civil Rights Act, 42 U.S.C. § 2000a, et seq., an enactment which provides in terms that its remedies are exclusive, 42 U.S.C. § 2000a–6(b), the Court held that a successful plaintiff should be awarded attorney's fees in the ordinary case, under a specific provision of the act. The Court noted, however, that such a sanction could have been imposed upon a defendant who litigated in bad faith for purposes of delay, Newman v. Piggie Park Enterprises, *supra*, 390 U.S. 402 n. 4, 88 S.Ct. 964, even had Congress not authorized by statute an award of counsel fees.

In *Mills* the Court directed that a corporation reimburse plaintiffs in a derivative suit for their attorney's fees, despite that the statute involved made specific provision for attorney's fees only in sections other than that on which liability was predicated in the action. Congress' failure to establish the precise bounds of possible relief for violation of its prohibitions (indeed the private right of action is implied) was thought to reflect an intention not to exclude the possibility of an award of attorney's fees under conventional principles. Mills v. Electric Auto-Lite Co., *supra*, 396 U.S. 391, 90 S.Ct. 616. The Court directed an interim award on a variation of the fund theory.

Lower courts have also construed federal enactments, old and recent, not to bar an award of attorney's fees when equity would require it, in the absence of indicia of congressional purpose to render such relief unavailable. See Lee v. Southern Home Sites Corp., 429 F.2d 290 (5th Cir. 1970) (42 U.S.C. § 1982); Kahan v. Rosenstiel, *supra*, (Securities Exchange Act § 10b, Rule 10b–5); Local 149, International Union, United Automobile, Aircraft and Agricultural Implement Manufacturers of America v. American Brake Shoe Co., 298 F.2d 212 (4th Cir.) cert. denied, 369 U.S. 873, 82 S.Ct. 1142, 8 L.Ed.2d 276 (1962) (Labor Management Relations Act § 301).

■ Section 1983 and general federal equitable power to protect constitutional rights are not restricted by any congressional language indicating an intention to preclude an award of counsel fees, either by express exclusion or the creation of an intricate remedial scheme. The statute creates liability

"in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

■ In its reference to suits in equity the statute must be taken to authorize relief, such as an award of counsel fees, as might normally be available in such suits. Case law prior to *Fleischmann* in school desegregation cases, discussed below, recognizes the power of a federal equity court trying a desegregation suit to award counsel fees. In the light of the decisions subsequent to *Fleischmann*, such construction of § 1983 is not subject to serious question.

The issue, then, is whether this case is a proper one for a discretionary award.

Many of the cases directing or approving an award of attorneys' fees turn upon the fund theory: the concept that, first, a litigant's counsel fees have been expended in such a manner as to benefit a number of other persons, not participating in the suit, and that, second, means are available whereby such outside beneficiaries can be made to bear something like a pro rata share of expenses by taking the fee from a defendant (a fiduciary, often) who holds or controls something in which the beneficiaries have an interest. School desegregation cases, or any suits against governmental bodies, do not fit this fund model without considerable cutting and trimming. This is a class suit to be sure, with class relief, but to say that the plaintiff class will actually in effect pay their attorneys if the School Board is made to pay counsel fees entails a number of unproved assumptions about

the extent to which pupils pay for their free public schooling.

Nonetheless, the fund theory does not exhaust the grounds on which an equity decree to pay counsel fees may be based. Other cases exist in which "overriding considerations indicate the need for such recovery." Mills v. Electric Auto-Lite Co., *supra*, 396 U.S. 391–392, 90 S.Ct. 625; see Note, 77 Harvard L.Rev. 1135 (1964). Such considerations in general are present when a party has used the litigation process for ends other than the legitimate resolution of actual legal disputes.

In Guardian Trust Co. v. Kansas City Southern Railway Co., 28 F.2d 233 (8th Cir. 1928), rev'd on other grounds, 281 U.S. 1, 50 S.Ct. 194, 74 L.Ed. 659 (1930), the Eighth Circuit reviewed exhaustively the circumstances in which an equity court might allow costs "as between solicitor and client" despite the lack of statutory authority. That court concluded that such a fee award was proper in a number of instances, including those in which a fiduciary has defended his trust, or a party has defended his title to certain property against baseless and vexatious litigation, or a defendant, charged with gross misconduct, has prevailed on the merits.

In Rude v. Buchhalter, 286 U.S. 451, 52 S.Ct. 605, 76 L.Ed. 1221 (1932), the Supreme Court held unwarranted an award of attorney's fees against an unsuccessful plaintiff where no finding of particular bad faith or an intent to "perpetrate a fraud or impose upon the court," *Id.*, 459, 52 S.Ct. 607, was made. The Court said also that those seeking such an award did not, on the record, appear deserving of such equitable treatment.

The Seventh Circuit, in In re Swartz, 130 F.2d 229 (7th Cir. 1942), approved an award of $1000 counsel fees to be paid by parties who forced an opponent into "unnecessary, groundless, vexatious, and oppressive," *Id.*, 231, litigation.

The Supreme Court, in Universal Oil Products Co. v. Root Refining Co., 328 U.S. 575, 66 S.Ct. 1176, 90 L.Ed. 1447 (1946), stated that it would be within the power of a court of equity to direct payment of an opponent's attorney's fees if required by "dominating reasons of justice," *Id.*, 580, 66 S.Ct. 1176, citing Sprague v. Ticonic National Bank, *supra*, 307 U.S. 167, 59 S.Ct. 777, 66 S.Ct. 1176, such as would be the case if a litigant had practiced a fraud upon the court.

A leading case in this Circuit is Rolax v. Atlantic Coast Line Railroad Co., 186 F.2d 473 (1951), a case from this Court. Chief Judge Parker gave the opinion that it would be entirely justifiable for the trial court, on remand, to tax as costs against the defendant labor union, guilty of a clear breach of its duty of fair representation, a reasonable attorneys' fee:

Ordinarily, of course, attorneys' fees, except as fixed by statute, should not be taxed as a part of the costs recovered by the prevailing party; but in a suit in equity where the taxation of such costs is essential to the doing of justice, they may be allowed in exceptional cases. The justification here is that plaintiffs of small means have been subject to discriminatory and oppressive conduct by a powerful labor organization which was required, as a bargaining agent, to protect their interests. The vindication of their rights necessarily involves greater expense in the employing of counsel to institute and carry on extensive and important litigation than the amount involved to the individual plaintiffs would justify their paying. In such situations, we think that the allowance of counsel fees in a reasonable amount as a part of the recoverable costs of the case is a matter resting in the sound discretion of the trial judge. *Id.*, 481.

Although the indication that such costs are proper if "essential to the

doing of justice" in a sense begs the question, the factors mentioned give some guidance. The suit obviously benefited an entire class of Negro locomotive firemen. The defendant, equipped with legislatively-conferred bargaining powers, owed them something akin to a fiduciary's concern and had violated that duty. The resources of the parties were disproportionate. The cost of litigation was disproportionate to the monetary benefit to any one plaintiff. Last, the legal issues were relatively settled before suit. Analogous factors are present in the instant litigation.

In Taussig v. Wellington Fund, Inc., 187 F.Supp. 179 (D.Del.1960), aff'd. 313 F.2d 472 (3d Cir. 1963), cert. denied, 374 U.S. 806, 83 S.Ct. 1693, 10 L.Ed.2d 1031 (1963), a stockholders derivative suit charging unfair competition, the shareholder plaintiffs were awarded attorneys' fees not out of the treasury of their corporation, which their lawsuit presumably benefited, but against those guilty of unfair practices. Such an equitable damage award, the court said, must be premised on a finding that "the wrongdoers' actions were unconscionable, fraudulent, willful, in bad faith, vexatious, or exceptional," *Id.*, 187 F. Supp. at 222 (footnotes omitted).

Our own Circuit ruled that it was within the power of a court of equity to award attorneys' fees in a suit under § 301 of the Taft-Hartley Act to enforce an arbitrator's award if it were shown that the employer's refusal to comply with the award was arbitrary and unjustified. The decision was based on precedents establishing a court's equitable power and on the judicial duty to develop a body of federal law under § 301. In the particular case the litigation was justified, and a fee award improper, because questions of some legal substance remained. Local 149, International Union, United Automobile, Aircraft and Agricultural Implement Workers of America v. American Brake Shoe Co., *supra.*

In Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), attorneys' fees as an item of damages on an admiralty case were held due when the owner's conduct toward an ill seaman was consistently stubborn:

> In the instant case respondents were callous in their attitude, making no investigation of libellant's claim and by their silence neither admitting nor denying it. As a result of that recalcitrance, libellant was forced to hire a lawyer and go to court to get what was plainly owed him under laws that are centuries old. The default was willful and persistent. *Id.*, 530–531, 82 S.Ct. 999.

A district court in another case declined to exercise its acknowledged equity power to award attorneys' fees in a suit against a labor union, finding no "fund" had been created and no compelling circumstances otherwise existed. The court commented, however, that:

> [W]ith the possible exception of civil rights litigation, see Bell v. School Bd., 321 F.2d 494, 500 (4th Cir. 1963), 77 Harv.L.Rev. 1135 (1964), no area is more susceptible to the salutary effects of the exercise of the chancellor's power to award counsel fees without the presence of a fund than litigation involving a member and his union. Primarily, this litigation seeks solely equitable relief and traditionally puts an impecunious group of members against a solvent union with little expectation of a substantial monetary award from which to pay a counsel fee, even a contingent one. This recognition has prompted several courts to allow counsel fees to successful union members who through litigation have corrected union abuse even though they have not established a fund or conferred a pecuniary benefit upon the commonwealth of the union. Cutler v. American Federation of Musicians, 231 F. Supp. 845 (S.D.N.Y.1964), aff'd. 366 F.2d 779 (2d Cir. 1966), cert. denied,

38

386 U.S. 993 [87 S.Ct. 1309, 18 L.Ed. 2d 338] (1967).

A class suit to reapportion a local government unit, Dyer v. Love, 307 F.Supp. 974 (N.D.Miss.1969), was the context for an award of counsel fees in a civil rights case. When the defendants, members of a board of supervisors, declined to reapportion their constituents, despite gross population variations between districts, and instead forced citizens to initiate "vigorously opposed" litigation, the court found this "unreasonable and obstinate" conduct to be fair basis for a fee allowance, even though there had been no Supreme Court holding during most of the suit's pendency explicitly defining the defendants' duty, *Id.*, 987. The direction of the developing law, the court said, should have been clear. Additionally, the court held that the absence of any fee agreement between plaintiffs and their lawyer constituted no bar to an award, because it was within the court's power to order payment to the attorneys themselves.

In another case out of the same court, an allowance of counsel fees was denied when the losing defendants, public educational administrators, were found not to have presented their defenses "in bad faith or for oppressive reasons," Stacy v. Williams, 50 F.R.D. 52 (N.D.Miss. 1970).

In Lee v. Southern Home Sites Corp., *supra*, the Fifth Circuit authorized attorneys' fee awards in a suit under 42 U.S.C. § 1982 contesting racial discrimination in housing sales, relying on the directive in Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L. Ed.2d 1189 (1968), to fashion appropriate and effective equitable remedies for § 1982 violations. The discretionary power clearly exists, the court said, and its exercise is especially appropriate in civil rights cases, where often discrimination with wide public impact can be terminated only by private lawsuit and problems of securing legal representation have been recognized. However, because the district court's exercise of its discretion could only be reviewed on the basis of factfindings on the relevant issues, the case was remanded for further proceedings.

▮ Numerous other cases support the power of a court of equity to allow counsel fees when a litigant's conduct has been vexatious or groundless, or he has been guilty of overreaching conduct or bad faith. See Siegel v. William E. Bookhultz & Sons, 136 U.S.App.D.C. 138, 419 F.2d 720 (1969); Smith v. Alleghany Corp., 394 F.2d 381 (2d Cir.) cert. denied, 393 U.S. 939, 89 S.Ct. 300, 21 L. Ed.2d 276 (1968); McClure v. Borne Chemical Co., 292 F.2d 824 (3d Cir.) cert. denied, 368 U.S. 939, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961); In re Carico, 308 F.Supp. 815 (E.D.Va.1970); Stevens v. Abbott, Proctor & Paine, 288 F.Supp. 836 (E.D.Va.1968).

School desegregation decisions illustrate the specific application of a court's equitable discretion to allow counsel fees to plaintiffs when the evidence shows obstinate noncompliance with the law or imposition by defendants on the judicial process for purposes of harassment or delay in affording rights clearly owing. See, e. g. Nesbit v. Statesville City Board of Education, 418 F.2d 1040 (4th Cir. 1969); Williams v. Kimbrough, *supra*; Cato v. Parham, 403 F.2d 12 (8th Cir. 1968); Rolfe v. County Board of Education of Lincoln County, 391 F.2d 77 (6th Cir. 1968); Hill v. Franklin County Board of Education, 390 F.2d 583 (6th Cir. 1968); Clark v. Board of Education of Little Rock School District, 369 F.2d 661 (6th Cir. 1966); Griffin v. County School Board of Prince Edward County, 363 F.2d 206 (4th Cir. 1966); Kemp v. Beasley, 352 F.2d 14 (8th Cir. 1965); Bradley v. School Board of City of Richmond, *supra*, 345 F.2d 310; Rogers v. Paul, 345 F.2d 117 (8th Cir.) rev'd. on other grounds, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965); Brown v. County School Board of Frederick County, 327 F.2d 655 (4th Cir.

1964); Bell v. County School Board of Powhatan County, 321 F.2d 494 (4th Cir. 1963); Pettaway v. County School Board of Surry County, 230 F.Supp. 480 (E.D.Va.) rev'd. on other grounds, Griffin v. Board of Sup'rs. of Prince Edward County, 339 F.2d 486 (4th Cir. 1964). See also, Felder v. Harnett County Board of Education, 409 F.2d 1070 (4th Cir. 1969), concerning Appellate Rule 38 and "frivolous" appeals.

A prior appellate opinion in this case states that district courts should properly exercise their power to allow counsel fees only "when it is found that the bringing of the action should have been unnecessary and was compelled by the school board's unreasonable, obdurate obstinacy." Bradley v. School Board of City of Richmond, supra, 345 F.2d at 321. The Court of Appeals recognized that appellate review of such orders, however, necessarily had a narrow scope and failed to disturb a nominal fee award.

In determining whether this particular lawsuit was unnecessarily precipitated by the School Board's obduracy, the Court cannot "turn the clock back," Brown v. Board of Education of Topeka, 347 U.S. 483, 492, 74 S.Ct. 686, 98 L.Ed. 873 (1954), to 1965. The School Board's conduct must be considered with reference to the state of the law in 1970. The Court has already reviewed the course of the litigation. It should be apparent that since 1968 at the latest the School Board was clearly in default of its constitutional duty. When hailed into court, moreover, it first admitted its noncompliance, then put into contest the responsibility for persisting segregation. When liability finally was established, it submitted and insisted on litigating the merits of so-called desegregation plans which could not meet announced judicial guidelines. At each stage of the proceedings the School Board's position has been that, given the choice between desegregating the schools and committing a contempt of court, they would choose the first, but that in any event desegregation would only come about by court order.

Other courts have catalogued the array of tactics used by school authorities in evading their constitutional responsibilities, Swann v. Charlotte-Mecklenburg Board of Education, supra, 401 U.S. at 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Jones v. Alfred H. Mayer Co., supra, 392 U.S. 448 n. 5, 88 S.Ct. 2186 (1968) (Douglas, J., concurring); Wright v. Council of the City of Emporia, 442 F.2d 570, 588 (4th Cir. 1971) (Sobeloff, J., dissenting). The freedom of choice plan under which Richmond was operating clearly was one such. When this Court filed its opinion of August 17, 1970, confirming the legal invalidity of that plan, the HEW proposal, and the interim plan, it was not propounding new legal doctrine. Because the relevant legal standards were clear it is not unfair to say that the litigation was unnecessary. It achieved, however, substantial delay in the full desegregation of city schools. Courts are not meant to be the conventional means by which persons' rights are afforded. The law favors settlement and voluntary compliance with the law. When parties must institute litigation to secure what is plainly due them, it is not unfair to characterize a defendant's conduct as obstinate and unreasonable and as a perversion of the purpose of adjudication, which is to settle actual disputes.

It is no argument to the contrary that political realities may compel school administrators to insist on integration by judicial decree and that this is the ordinary, usual means of achieving compliance with constitutional desegregation standards. If such considerations lead parties to mount defenses without hope of success, the judicial process is nonetheless imposed upon and the plaintiffs are callously put to unreasonable and unnecessary expense.

As long ago as 1966 a court of appeals in another circuit uttered a strong

suggestion that evasion and obstruction of desegregation should be discouraged by compelling state officials to bear the cost of relief:

> The Board is under an immediate and absolute constitutional duty to afford non-racially operated school programs, and it has been given judicial and executive guidelines for the performance of that duty. If well known constitutional guarantees continue to be ignored or abridged and individual pupils are forced to resort to the courts for protection, the time is fast approaching when the additional sanction of substantial attorneys fees should be seriously considered by the trial courts. Almost solely because of the obstinate, adamant, and open resistance to the law, the educational system of Little Rock has been embroiled in a decade of costly litigation, while constitutionally guaranteed and protected rights were collectively and individually violated. The time is coming to an end when recalcitrant state officials can force unwilling victims of illegal discrimination to bear the constant and crushing expense of enforcing their constitutionally accorded rights. Clark v. Board of Education of Little Rock School District, *supra,* 369 F.2d 671.

That time has now expired. See also, Cato v. Parham, *supra*. Our Court of Appeals, too, has indicated a willingness to place litigation costs on defendants in recent cases; in Nesbit v. Statesville City Board of Education, *supra*, they took the unusual step of directing the district court to exercise its discretion in the matter in favor of the plaintiffs. This was also done six years before in Bell v. County School Board of Powhatan County, *supra*, when aggravated misconduct was shown; in *Nesbit*, by contrast, the defendants seem to have been guilty of delay alone.

Not only has the continued litigation herein been precipitated by the defendants' reluctance to accept clear legal direction, but other compelling circumstances make an equitable allowance necessary. This has been a long and complex set of hearings. Plaintiffs' counsel have demonstrated admirable expertise, discussed below, but from the beginning the resources of opposing parties have been disproportionate. Ranged against the plaintiffs have been the legal staff of the City Attorney's office and retained counsel highly experienced in trial work. Additionally the School Board possessed the assistance of its entire administrative staff for investigation and analysis of information, preparation of evidence, and expert testimony of educators. Few litigants—even the wealthiest—come into court with resources at once so formidable and so suited to the litigation task at hand. Sums paid outside counsel alone far exceed the plaintiffs' estimate of the cost of their time and effort.

Moreover, this sort of case is an enterprise on which any private individual should shudder to embark. No substantial damage award is every likely, and yet the costs of proving a case for injunctive relief are high. To secure counsel willing to undertake the job of trial, including the substantial duty of representing an entire class (something which must give pause to all attorneys, sensitive as is the profession to its ethical responsibilities) necessarily means that someone—plaintiff or lawyer—must make a great sacrifice unless equity intervenes. Coupled with the cost of proof is the likely personal and professional cost to counsel who work to vindicate minority rights in an atmosphere of resistance or outright hostility to their efforts. See NAACP v. Button, 371 U.S. 415, 435–436, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Sanders v. Russell, 401 F.2d 241 (5th Cir. 1968).

Still further, the Court must note that the defendants' delay and inaction constituted more than a cause for needless litigation. It inspired in a community conditioned to segregated schools a false

hope that constitutional interpretations as enunciated by the courts pursuant to their responsibilities, as intended by the Constitution, could in some manner, other than as contemplated by that very document, be influenced by the sentiment of a community.

The foregoing in no manner is intended to express a lack of personal compassion for the difficult and arduous task imposed upon the members of the defendant school board. Nevertheless they, and indeed the other defendants as well, had a public trust to encourage what may well be considered one of the most precious resources of a community; an attitude of prompt adherence to the law regardless of the manifested erroneous view that mere opposition to constitutional requirements would in some manner result in a change in those requirements.

Power over public education carries with it the duty to provide that education in a constitutional manner, a duty in which the defendants failed.

These general factors were present, although in lesser magnitude, in the *Rolax* case in 1951, in which the Fourth Circuit said that an award of counsel fees would be fully justified.

Passing the question of the appropriateness of allowing fees on the basis of traditional equitable standards, the Court is persuaded that in 1970 and 1971 the character of school desegregation litigation has become such that full and appropriate relief must include the award of expenses of litigation. This is an alternative ground for today's ruling.

The circumstances which persuaded Congress to authorize the payment of attorney's fees by statute under certain sections of the 1964 Civil Rights Act, see 42 U.S.C. §§ 2000a–3(b), 2000e–5(k), very often are present in even greater degree in school desegregation litigation. Newman v. Piggie Park Enterprises, Inc., *supra*, the Supreme Court elucidated the logic underlying the 1964 legislation:

When the Civil Rights Act of 1964 was passed, it was evident that enforcement would prove difficult and that the Nation would have to rely in part upon private litigation as a means of securing broad compliance with the law. A Title II suit is thus private in form only. When a plaintiff brings an action under that Title, he cannot recover damages. If he obtains an injunction, he does so not for himself alone but also as a "private attorney general," vindicating a policy that Congress considered of the highest priority. If succsssful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts. *Id.* 390 U.S., 401–402, 88 S.Ct. 966.

*Newman* was followed in Miller v. Amusement Enterprises, Inc., 426 F.2d 534 (5th Cir. 1970), in which the court recognized that in cases there the plaintiffs had undertaken no obligation to pay counsel, congressional purposes would best be served by directing payment to the lawyers.

The rationale of *Newman,* moreover, has equal force in employment discrimination cases, even where plaintiffs are only partially successful, where their lawsuit serves to bring an employer into compliance with the Act. Lea v. Cone Mills Corp., 438 F.2d 86 (4th Cir. 1971); Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (5th Cir. 1970).

School desegregation cases almost universally proceed as class actions. Use of this unconventional form of action converts a private lawsuit into something like an administrative hearing on compliance of a crucial public facility with legal rules defining, in part, its mission. Such result has come about as the law developed so that it protects as a matter of individual right not just admission into formerly white schools of black applicants, but attendance in a nondiscrim-

inatory school system. Green v. County School Board of New Kent County, *supra*; Bradley v. School Board of City of Richmond, 317 F.2d 429 (4th Cir. 1963).

Manifestly, too, not only are the rights of many asserted in such suits, but also it has become a matter of vital governmental policy not just that such rights be protected, but that they be immediately vindicated in fact. See 42 U.S.C. § 2000e et seq. Partly this national goal has been pursued by administrative proceedings, but a large part of the job has fallen to the courts, and for them it has been a task of unaccustomed extent and difficulty. "Nothing in our national experience prior to 1955 prepared anyone for dealing with changes and adjustments of the magnitude and complexity encountered since then." Swann v. Charlotte-Mecklenburg Board of Education, *supra*, 401 U.S. 1, 91 S.Ct. 1267.

■ The private lawyer in such a case most accurately may be described as "a private attorney general." Whatever the conduct of defendants may have been, it is intolerably anomalous that counsel entrusted with guarantying the effectuation of a public policy of nondiscrimination as to a large proportion of citizens should be compelled to look to himself or to private individuals for the resources needed to make his proof. The fulfillment of constitutional guaranties, when to do so profoundly alters a key social institution and causes reverberations of untraceable extent throughout the community, is not a private matter. Indeed it may be argued that it is a task which might better be undertaken in some framework other than the adversary system. Courts adapt, however; but in doing so they must recognize the new legal vehicles they create and ensure that justice is accomplished fully as effectively as under the old ones. The tools are available. Under the Civil Rights Act courts are required fully to remedy an established wrong, Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 232–234, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964), and the payment of fees and expenses in class actions like this one is a necessary ingredient of such a remedy.

■ This rule is consistent with the Court's power and serves an evident public policy to encourage the just and efficient disposition of cases concerning school desegregation. Cf. 42 U.S.C. § 2000c–6. It serves no person's interest to decide these cases on the basis of a haphazard presentation of evidence, hampered by inadequate manpower for research into the bases of liability and the elements of relief. Where the interests of so many are at stake, justice demands that the plaintiffs' attorneys be equipped to inform the court of the consequences of available choices; this can only be done if the availability of funds for representation is not left to chance. In this unprecedented form of public proceeding, exercise of equity power requires the Court to allow counsel's fees and expenses, in a field in which Congress has authorized broad equitable remedies "unless special circumstances would render such an award unjust," Newman v. Piggie Park Enterprises, Inc., *supra*, 390 U.S. 402, 88 S.Ct. 966. No such circumstances are present here.

The amount of the allowance is not difficult to establish. Counsel have agreed to submit the matter of costs, fees and expenses to the Court on documentary evidence. The period of time to which this opinion relates runs from the March, 1970, motion for further relief until January 29, 1971. Findings of fact as to defendants' actions after that date have been made; these tend to establish their continuing pattern of inaction and resistance.

Trial counsel for the plaintiffs demonstrated throughout the litigation a grasp of the material facts and a command of the relevant law equaled by very few lawyers who have appeared before this Court. Needless to say their understanding of the field enabled them to be

of substantial assistance to the Court, which is their duty. Local counsel did not examine witnesses, but assisted in pretrial preparation and also at hearings, as required by local rules. Some of the working hours included in counsel's estimates of time spent, moreover, include travel times. These are properly listed for two reasons. First, counsel can and do work while traveling. Second, other complex cases often require parties to enlist the aid of out-of-town counsel, for whose travel time they pay.

In conformity with practice in his home bar of Memphis, Tennessee, a lawyer for the plaintiffs secured three affidavits from disinterested brother counsel stating their estimate of the fair value of legal services rendered by plaintiffs' counsel. The affidavits state facts showing a current familiarity with prevailing fee rates and with, in two cases, the full case file. Considering the abilities of counsel, the time required, and the results achieved, these lawyers placed a value on the services very close to the estimates of the plaintiffs.

The Virginia Supreme Court of Appeals long ago set forth the factors relevant to the value of an attorney's services:

"[c]ircumstances to be considered * * * are the amount and character of the services rendered, the responsibility imposed; the labor, time, and trouble involved; the character and importance of the matter in which the services are rendered; the amount of money or the value of the property to be affected; the professional skill and experience called for; the character and standing in their profession of the attorneys; and whether or not the fee is absolute or contingent * * * The result secured by the services of the attorney may likewise be consid-

ered; but merely as bearing upon the consideration of the efficiency with which they were rendered, and, in that way, upon their value on a quantum meruit, not from the standpoint of their value to the client." Campbell County v. Howard, 133 Va. 19, 112 S.E. 876, 885 (1922).

In this case the marshalling of evidence on liability and especially on remedy were complex tasks. The responsibility was probably as great as ever falls upon a private lawyer. Time spent was considerable; the Court accepts the estimates of time and expenses dated January 6, 1970, as modified in a memorandum submitted on March 15, 1970. The subject of the litigation was of the utmost importance. The Court has already referred to the lawyers' performance, which they undertook without assurance of reasonable compensation. Substantial results, too, were secured by their efforts.

■ On the basis of these factors, plus the equitable considerations compelling an allowance, the court has determined that a reasonable attorney's fee would be $43,355.00.[8]

Expenses incurred, including taxable costs, have also been estimated by the plaintiffs. As in the case of attorney's fees, these cover the period from March of 1970 through January 29, 1971, and relief is not requested with reference to matters raised by the motion for joinder of further parties filed by the School Board. Costs and expenses as to those matters are therefore not under consideration.

■ Because the Court has decided that plaintiffs' counsel are due an allowance of the actual expenses of the litigation, it is not necessary to determine

---

8. The Court has reduced the requested allowance pursuant to the supplemental memorandum filed by plaintiffs under date of Mar. 15, 1971, and in addition has deducted the item of $990 having to do with City Council's requested stay of Court's order of August 1970.

whether certain items of expense would in the usual case be taxable as costs under 28 U.S.C. § 1920; see 6 Moore's Federal Practice ¶ 54.70, et seq. (2d ed. 1966).

■ Many of the expenses incurred by plaintiffs' counsel are attributable to their traveling from New York and Memphis for preparation and trial, but, as the Court already said, the complexity of cases of this sort often, as here, justifies the use of counsel from outside the local bar. The difficulty of retaining local trial counsel must be especially great in litigation over minorities' civil rights; the unpopularity of the causes and the likelihood of small reward discourage many lawyers even from mastering the field of law, much less accepting the cases. Expenses for travel, hotel accommodations and restaurant meals are fairly allowable. The Court takes notice of the fact that the absence of an attorney from the area of his office usually results in financial hardship in relation to the balance of his practice, and there ought not to be superimposed thereon additional living expenses.

■ Fees for expert witnesses' testimony likewise will be allowed as an expense of suit. It is difficult to imagine a more necessary item of proof (and source of assistance to the Court) than the considered opinion of an educational expert.

■ Investigation assistance and office supplies likewise are obviously proper; one must contrast the rather minimal expenses of the plaintiffs under this heading with the resources used by the defendants.

■ Transcript costs, including those for depositions which were taken with the Court's encouragement, and miscellaneous court fees are allowable.

The Court will not assess against the School Board, however, expenses occasioned by the stay applications unsuccessfully filed by the Richmond City Council. These may be considered on a separate application.

The Court computes the total allowable expenses to be $13,064.65. The total award, including counsel fees, comes to $56,419.65.[9] This is a large amount, but it falls well below the value of efforts made in defending the suit. Outside counsel for the School Board to date have submitted bills well in excess of the amounts awarded. [Portions of the submitted bills cover periods with which we are not here concerned.] In addition, as noted above, the defendants made use of the regular legal staff of the City Attorney and the School Board's administrative staff. For purposes of comparison, in a recent antitrust case tried by one Richmond attorney and two lawyers from outside the local bar, this Court awarded $117,000 in counsel fees. The amount in this case is not excessive.

For the reasons stated, an order shall enter this day decreeing the payment of the sum mentioned to counsel for the plaintiffs.

---

9. Expenses incurred in reference to City Council's request for stay of August 1970 order are not included herein, nor are expenses allocated to filing of amended complaint.